

**SIGNED this 3rd day of December, 2014**

_Shelley D. Rucker_

Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

**This memorandum is not intended for publication.**
**The opinion has limited precedential value.**


### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF TENNESSEE
### WINCHESTER DIVISION

In re:

JEFFREY METCALF                                         No. 12-12972
dba JM CONSTRUCTION & REMODELING         Chapter 7

       Debtor;

ROBERT W. VERBELIA and
BETTY Y. VERBELIA,

       Plaintiffs,

v.

                                        Adversary Proceeding
                                        No. 12-1087

JEFFREY METCALF dba
JM CONSTRUCTION & REMODELING

       Defendants

1

## MEMORANDUM

Plaintiffs Robert ("Bob") W. Verbelia and Betty Y. Verbelia (collectively "Plaintiffs" or "Verbelias") have filed this adversary proceeding against debtor Jeffrey Metcalf, d/b/a JM Construction & Remodeling ("Mr. Metcalf" or "Defendant"). The Plaintiffs allege nine separate claims against Mr. Metcalf related to his performance of a contract to construct the Plaintiffs' residence in Tullahoma, Tennessee. *See* [Doc. No. 1, Complaint].[1] Their claims against him include: (1) breach of contract; (2) breach of warranty; (3) breach of the covenant of good faith and fair dealing; (4) defective design and construction; (5) violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104 ("TCPA"); (6) exaggeration of lien; (7) liens of other subcontractors; (8) rescission; and (9) punitive damages. They seek a judgment for these claims and object to the dischargeability of any judgment awarded on account of these claims pursuant to 11 U.S.C. § 523(a)(2). They contend that their claims are debts which arose from false pretenses, false representations, or actual fraud by Mr. Metcalf in either the creation or execution of a residential construction contract.

The court has considered the evidence provided by the parties during the four day trial, the pleadings and briefs filed by counsel, and the entire record in this case. The court makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

In summary, the court finds that the Verbelias have allowed unsecured claims against Mr. Metcalf in the amount of $246,874.13 based on the breach of contract. Of this amount, the court finds that $4000 is a debt that is owed to the Verbelias on account of fraud, false pretenses or misrepresentations made by Mr. Metcalf during the construction of the residence and thus is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). The court finds that the remaining amount of the claim is dischargeable; and as to that amount, the Verbelias' objection to the

---

[1] All docket entry references refer to docket entries for Adversary Proceeding No. 12-1087, unless otherwise noted.

dischargeability of that debt based on Section 523(a)(2)(A) is denied. The court will sustain the objection to the dischargeability of $4000 and enter a nondischargeable judgment in favor of the Plaintiffs in the amount of $4000.

With respect to the Plaintiffs' additional state law claims, including breach of the covenant of good faith and fair dealing, defective design or construction, exaggeration of lien pursuant to Tenn. Code Ann. § 66-11-139, liens of other subcontractors, and rescission, the court concludes that the Plaintiffs have failed to demonstrate the requisite elements of each such claim. These claims shall be dismissed. As to breach of warranty, the court finds that the implied warranty was breached but no additional damages are appropriate. The court further declines to award the Plaintiffs punitive damages. The court does find that there was a violation of the TCPA but does not find that there are any additional nondischargeable debts created by that violation. The court will allow the Plaintiffs to put on proof as to attorney's fees pursuant to Tenn. Code Ann. §§ 62-6-136(a) and 47-18-109(e)(1) for purposes of allowance of an unsecured claim, but the court will not sustain an objection to the dischargeability of the attorney's fees.

## I.    FACTS

### A.    The Plaintiffs' Dream House

In 2006, the Verbelias retired to Tennessee from Montana to be near their daughter, her husband and their grandchildren. Trial Testimony of Robert Verbelia ("R. Verbelia Test."), April 8, 2014, 2:17 p.m., 3:27-3:28 p.m.; Trial Testimony of Betty Verbelia ("B. Verbelia Test."), April 7, 2014, 4:03 p.m. They located a 37-acre tract of land on Lake Haven Drive in Tullahoma, Tennessee, near their daughter's home and began plans to purchase the property and to build what Mrs. Verbelia described as her "dream house."  Trial Ex. L; B. Verbelia Test., April 7, 2014, 4:03 p.m. She testified that she wanted a one-level structure that was "handicapped

accessible" because of physical problems she had with stairs. B. Verbelia Test., April 7, 2014,

3:00 p.m., 3:35 p.m. *See also,* Trial Testimony of Tim Morrison ("T. Morrison Test."), April 7,

2014, 2:11 p.m. The Defendant testified that Mrs. Verbelia wanted the house built on a hillside

with a view of a lake located on the property.  Trial Testimony of Jeffrey Metcalf ("Metcalf

Test."), April 9, 2014, 3:16-3:17 p.m. She also wanted a basement because she was terrified of

tornadoes. B. Verbelia Testimony, April 7, 2014, 3:35-3:36 p.m. Her concern about weather also

led her to want an exterior made of "all brick" capable of withstanding extreme weather.  B.

Verbelia Testimony, April 8, 2014 at 9:44 a.m. She worked with a home designer, Joan Bentley,

who prepared drawings for a one-level structure of just under 5000 square feet to be set on a

slightly sloping lot. Trial Testimony of Joan Bentley ("Bentley Test."), June 10, 2014, 1:56,

2:08, 2:10 p.m.

     Robert Verbelia set about trying to find a contractor, but in 2006, builders were hard to

find because of the housing boom. R. Verbelia Test., April 8, 2014, 2:25-2:26 p.m. He finally

discussed a building contract with a Mr. Woodard who offered to build the house but not for a

fixed price. *Id.* at 2:26 p.m., 2:34 p.m. Mr. Verbelia testified that they had a budget for

construction of $300,000 and were very concerned that they not exceed that price. *Id.* at 2:29-

2:32, 2:35 p.m.

     Prior to purchasing the property, the Verbelias obtained a percolation test for septic tank

approval on May 31, 2006. B. Verbelia Test., April 7, 2014, 2:56 p.m. Woodard Enterprises was

listed as the contractor. Trial Ex. L, p. 2. No contract was ever signed with Mr. Woodard as a

result of the intervention of their son-in-law. R. Verbelia Test., April 8, 2014, 3:30-3:31 p.m. His

intervention is discussed in more detail below.

     The Verbelias acquired the property, and on July 10, 2006, Mrs. Verbelia obtained a

building permit for $270,000.  Trial Ex. L. She indicated that "self" was the Tennessee licensed

contractor. *Id*. at 1. She also attached an affidavit to the application stating that she was

exempted from the Tennessee Workers Compensation laws, but at trial she testified that she did

not know what the affidavit meant. *Id*. at 5. Mr. Metcalf's name did not appear as the contractor

on the permit. *Id*. at 5. He did not even make a proposal to them until July 17, 2014. Trial Ex. 23.

**B.      The Selection of Mr. Metcalf and his Representations**

The Verbelia's son-in-law Tim Morrison had opened a flooring store in Tullahoma,

Tennessee and was aware of the trouble his in-laws were having finding a contractor. T.

Morrison Test., April 7, 2014, 2:29-2:30 p.m. He spoke to Mr. Metcalf and suggested that he

approach the Verbelias about bidding on the job. *Id*. at 2:32-2:33 p.m. Mr. Metcalf was hesitant

about approaching the Verbelias, whom he had never met, but did so after being encouraged to

do so a second time by Mr. Morrison. J. Metcalf Test., April 9, 2014, 3:00-3:01, 3:04 p.m. Mr.

Morrison urged him to hurry because his in-laws were about to sign a contract with Mr.

Woodard. *Id*.

On July 6 of 2006, the Debtor went to the Verbelias' home as Mr. Morrison had

requested.  J. Metcalf Test., April 9, 2014, 3:02, 3:04 p.m. He testified that he talked to them

about making a bid to build their home for a fixed price. *Id*. at 3:05 p.m. Mrs. Verbelia provided

him with some construction plans which he testified consisted of several pages of drawings by a

home designer for the floor plan and the elevations. *Id*. at 3:04 p.m., 3:17-3:18, 3:24 p.m. There

were no specifications for the flooring or doors. *Id*. at 3:05-3:06 p.m. Mr. Metcalf returned with a

bid for $287,000 and requested minor changes to the plans. Trial Ex. 23; J. Metcalf Test., April

9, 2014, 3:11 p.m. Mrs. Verbelia testified that she was fine with these changes, which she also

viewed as minor, and she took the plans back to her home designer to make the changes on the

plans. B. Verbelia Test., April 7, 2014, 3:01-3:02 p.m. Ms. Bentley testified she made the

changes. Bentley Test., June 10, 2014, 2:00 p.m. Ms. Bentley designed the house to be one-level

to be built on a site with a "slight slope." *Id.* at 2:10 p.m. She estimated the size to be "a little

under 5000 square feet." *Id.* at 2:07 p.m. As a home designer she was limited to designing homes

of 5000 square feet or less. *Id.*

### 1.    Representation regarding license

Mr. Verbelia testified that he wanted to use only a licensed contractor for the job and that

Mr. Metcalf represented to Mr. Verbelia that he was a licensed contractor. R. Verbelia Test.,

April 8, 2014, 2:27 p.m. Mr. Verbelia testified that he "definitely" wanted someone with a

"contractor's license" who was a "good builder." *Id.* Mrs. Verbelia also testified that the Debtor

showed them his license. B. Verbelia Test., April 7, 2014, 2:57 p.m. The actual document that

was shown to her was not offered as evidence. The Debtor did have a license; however, the

amount of his license in 2006 was for only $150,000.  Trial Ex. 22. Plaintiffs testified that they

did not know that he did not have a license in a sufficient amount to build the house for which

they were negotiating at the time they signed the contract with him. They testified that had they

known that the amount of his license was not enough, they would never have entered into the

contract. R. Verbelia Test., April 8, 2014, 2:27 p.m.; B. Verbelia Test., April 7, 2014, 4:02 p.m.

There was no evidence that the Verbelias did any other investigation regarding the license prior

to signing the contract. The court notes that Mr. Metcalf's license no. 00056376 was listed on the

documents which both parties signed. Trial Ex. 23.

### 2.    Representations regarding expertise

The parties had "long conversations about everything." B. Verbelia Test., April 7, 2014,

2:59-3:00 p.m. They continued to negotiate for the next several days regarding whether the house

would be all brick and whether the foundation would be made of Logixblocks. Mr. Verbelia

testified that Mr. Metcalf represented himself to be an "expert builder." R. Verbelia Test., April

8, 2014, 2:27 p.m. He also testified that Mr. Metcalf claimed he was an expert in the installation

of Logixblocks. *Id.* at 3:37 p.m. Logixblocks were selected to make the house more secure from

tornadoes. The product requires special installation and the pouring of concrete into the blocks to

create a solid wall. J. Metcalf Test., April 9, 2014, 3:02-3:03 p.m. Mr. Morrison testified that he

had noticed Mr. Metcalf installing the blocks at the home of one of Mr. Morrison's neighbors

whose name was Linda. T. Morrison Test., April 7, 2014, 2:17 p.m. The Verbelias testified that

Mr. Metcalf took them to see an installation of the blocks he had completed and to see a house he

had built in the area belonging to Mr. Ray. R. Verbelia Test., April 8, 2014, 3:37 p.m.; B.

Verbelia Test., April 7, 2014, 2:57-2:58 p.m. They also testified that they were aware of other

properties he had built. B. Verbelia Test., April 7, 2014, 4:10-4:11 p.m.; R. Verbelia Test., April

8, 2014, 3:37 p.m. With this due diligence, the parties signed a document on July 21, 2006,

which will be discussed in more detail below. Trial Ex. 3.

The installation of the Logixblocks is one of the major issues in contention. The

Verbelias argue that the Logixblocks were larger than regular concrete blocks and therefore were

not properly installed on the footings that were poured.  Ms. Bentley, the home designer, testified

that her plans did not call for Logixblocks. Bentley Test., June 10, 2014, 2:07 p.m. Ms. Bentley

is neither an architect nor engineer and so was not able to give an expert opinion on whether the

problems that later developed with the house were attributable to this variation from her

drawings. She was also not consulted by the Verbelias after they decided to change the materials.

The Verbelias offered no other expert testimony to connect the installation of the Logixblocks to

the cracks that later developed.

Mr. Metcalf testified that at the time he signed the contract with the Verbelias, he had

been in construction for his whole life. J. Metcalf Test., April 9, 2014, 2:58-2:59 p.m. He started

as a roofer with his father and had been in property management in Illinois. *Id.* He moved to

Tennessee in 1996 where he obtained his contractor's license in 2000. *Id.* at 2:59-3:00 p.m. He

had applied for a higher license in 2006 but had been turned down for an amount greater than

$150,000. *See* Trial Ex. 22. He was aware of his limit of $150,000 when he signed the contract,

but he believed that he could construct the house. J. Metcalf Test., April 9, 2014, 3:00, 3:08 p.m.

His prior experience included building other homes in the same neighborhood as the Verbelias'

home, including the Van Olin's family home and Pam Carlson's home, as well as the Ray home

in a neighborhood known as Hopkins Point. He had also built other homes and completed several

remodeling jobs. B. Verbelia Test., April 7, 2014, 4:10-4:11 p.m.; J. Metcalf Test., April 7, 2014,

1:55-1:57 p.m.; June 10, 2014, 11:01 a.m. Mr. Ray testified as a rebuttal witness that he was not

satisfied with Mr. Metcalf's work on his home. Testimony of John Ray, June 10, 2014, at 1:37-

1:39 p.m.

### 3. Representation regarding time of completion and cost

The Verbelias accepted Mr. Metcalf's proposal on July 21, 2006. Trial Ex. 3. The

document, which was dated July 17, 2006 by Mr. Metcalf, provided that construction would

begin on or before August 1, 2006 and be completed in April of 2007. Trial Ex. 3. The price was

for $264,000, not to exceed $283,000 for brick. *Id*. The cost was $264,000 increased to $283,000

for brick plus $15,000 for solid walls, for a total of $298,000. Trial Ex. 3. The Verbelias were

pleased with the fixed cost contract. Mr. Verbelia testified that he even asked Mr. Metcalf what

happened if the house cost more than that. He testified that Mr. Metcalf told him, "don't worry

about that, because I can make it up on my next house." R. Verbelia Test., April 8, 2014, 2:35

p.m.; *see also* B. Verbelia Test., April 7, 2014, 4:53-4:54 p.m.

### C.    The Construction Contract

The Plaintiffs offered three exhibits to evidence their agreement with Mr. Metcalf. Trial

Exhibit 1 is labeled as a proposal. It is not signed, it is missing a page numbered 4, and contains

a page numbered "Page 5" which is not contained in the two other versions of their agreement

offered at trial. *See* Trial Exs. 3 and 23. For purposes of the court's analysis, it considers Trial

Exhibit 1 a copy of what was proposed, but not what was agreed to.

Trial Exhibit 3 is signed twice and consists of five pages, although the pages are not

numbered consecutively. Trial Exhibit 23 appears to have the same pages contained in Trial

Exhibit 3, but also contains notations made by Mrs. Verbelia regarding the additional costs for

the driveway and an accounting of how disbursements were made. For purposes of analyzing the

contract, the court finds that Trial Exhibit 3 reflects the parties' written agreement. Trial Exhibit

23 contains all of the terms of Trial Exhibit 3 plus additional agreements reached after the

contract was signed.

Trial Exhibit 3 contains several parts. The first is a one-page document entitled

"Proposal" with the word "Final" handwritten across the top ("Proposal"). *See* Trial Ex. 3. This

page provides that the "[c]ontractor hereby submits the following specifications: to furnish all

material & labor to start and complete house according to plans on specs furnished by

homeowners Betty & Bob." *Id.* The Proposal offered to "furnish material and labor for the sum

of $264,000 not [to] exceed" $283,000 "for brick". *Id.* The payment schedule was "in one third

payments, if agreed by homeowner & contractor" and "$15,000 additional for all preformed

concrete work." The Proposal states that "[a]ny alteration or deviation from the above

specifications involving extra costs will be executed only upon a written order and will become

an extra charge over and above the proposed estimate. All agreements are subject to any strikes, accidents, or delays beyond the contractor's control." *Id.*

The second page of Trial Exhibit 3, with the handwritten notation of "page two" at the bottom, is a three column checklist with headings named for rooms or fixtures followed by specific items which relate to the rooms or fixtures. For example, below the heading "Appliances" there are three items: "Furnace/Pilot," "Water Heater/Pilot," and "Venting." Beside each item is a box to be checked. All three boxes were checked with a handwritten notation which the court interprets as a specification that the appliances are to be electric. Both parties treated this page as part of their contract. In addition to "Appliances," the headings include "Stairs/Hallway," "Basement/Crawl Space," "Bedrooms, Baths/Powder Room" and "Exterior" Trial Ex. 3, p. 2. Like the Appliances section, the boxes under each heading were checked for everything except for the following items "Electric/Fixtures" under  the heading "Stairs/Hallway;" "window well gravel, sump/ejector pumps, and pull chains" under "Basement/Crawl Space;" " medicine cabinets/mirrors" under "Baths/Powder Rooms" (although the item was circled, not checked); and "address numbers, siding/caulking, railings, landscaping, window well covers, exterior light fixtures, and splash blocks" under "Exterior." *Id.* This page also contains handwritten notes modifying or clarifying what the parties are agreeing on, such as the addition of "outside faucets" and "30 yrs" indicated next to "roofing." Doors are required to be "solid core" for outside doors and the "2 main bathroom doors," and "solid ducting not accordion" is written on this page. Trial Ex. 3 at 2.

The third page of Trial Exhibit 3 is entitled "Customer Walk Through." It is numbered with a printed "page 1" at the bottom; and like "page two," there are boxes to be checked beside items listed below the headings "Kitchen," "Living Room/ Dining Room," "Foyer," "Family

Room," "Utility Room," and "Service Hall." Trial Ex. 3 at p. 3. Unlike the checked boxes of

page two, no boxes were checked for the items under each heading on this page.  In fact, there is

no writing on this page at all, unlike the detailed markings and notations on the second page.

The court notes that this unmarked third page contains rooms that do not appear on the second

page. The contract is therefore confusing as it appears that the third page of the Trial Exhibit 3

was originally the second page of a form for a customer walk through punch list to be completed

at the end of construction. The court's assessment of the intended use of this two-page form is

confirmed by the  title on page 3 "Customer Walk Through", the same font being used for both

pages, and, if considered together, the headings cover all of the rooms one would expect to find

in a home. Finally, there are blank signature lines at the bottom of the page hand-numbered

"page two" for an "Inspector" and the "Home Owner" to sign.

 Nevertheless, the parties did not use these two pages this way, but rather, incorporated

them as part of their agreement. The court is therefore left to wonder about the significance of

the unchecked boxes. There was no testimony regarding the significance of a mark in one of the

boxes and no marks beside others. Many of the items on the list of the Verbelias' damages are

materials that relate to rooms on the list on page three such as cabinets, flooring in the kitchen,

dining room, foyer, family room, utility room and service hall; however, none of those boxes

were checked. The court also questions why there are many notes on "page two," but not a single

mark on the third page of Trial Ex. 3. (The court will refer to pages 2 and 3 as the

"Specifications.")

The last two pages are labeled as "California Contractor Agreement," although none of

the parties are from California. *Id.* at 4-5. (These two pages are referred to as the California

Contractor Agreement. The five pages contained in Trial Ex. 3 will be referred to collectively as

the "Agreement".)  In a section entitled "Time of Completion" the work on the construction was

to commence on or before August 1, 2006 to be "substantially completed" by April 2007. The

section further states that "[t]ime is of the essence. The following constitutes substantial

completion of work pursuant to this proposal and contract: (Specify) should be able to move

some things in different places of house." A section entitled "The Contract Price" indicates that

"[t]he Owner shall pay the Contractor for the material and labor to be performed under the

Contract the sum of $264,000, $283,000 for brick and $15,000 solid walls, Total based on

$298,000." *Id.* at p. 4. Under "General Provisions" in the California Contractor Agreement, it

states:

> Any alteration or deviation from the above specifications, including but
> not limited to any such alteration or deviation involving additional material and/or
> labor costs, will be executed only upon a written order for same, signed by Owner
> and Contractor, and if there is any charge for such alteration or deviation, the
> additional charge will be added to the contract price of this contract.
> If payment is not made when due, Contractor may suspend work on the
> job until such time as all payments due have been made. A failure to make
> payment for a period in excess of [sic] days from the due date of the payment
> shall be deemed a material breach of this contract.
> In addition, the following general provisions apply:
> 1.    All work shall be completed in a workman-like manner and in
> compliance with all building codes and other applicable laws.
> 2.    The contractor shall furnish a plan and scale drawing showing the
> shape, size dimensions, and construction and equipment specifications for home
> improvements, a description of the work to be done[.]

*Id.* at p. 4. This page is followed by the signature page which is signed by Mr. Metcalf and the

Verbelias.

In addition to the terms reflected in the Agreement, Mrs. Verbelia testified that she

discussed using her son-in-law for the flooring with Mr. Metcalf. B. Verbelia Test., April 7,

2014, 4:01 p.m. Mrs. Verbelia testified that she asked Mr. Metcalf if she could pay Mr. Morrison

directly. B. Verbelia Test., April 7, 2014, 4:01-4:02 p.m. She also testified that Mr. Metcalf was

initially pleased to use Mr. Morrison to purchase materials because Mr. Metcalf "was getting a big discount. . . ." *Id.* at 4:01 p.m. She testified that Mr. Metcalf would allow her to pay either him or her son-in-law directly. She testified that Mr. Metcalf agreed and gave them a budget of $5.00 a square foot for the flooring. She understood that if her flooring selections exceeded $5.00 a square foot that she would be responsible for the additional amount. B. Verbelia Test., June 10, 2014, 11:11-11:14 a.m.; Trial Ex. F. Mr. Morrison also confirmed that was his understanding in his testimony. T. Morrison Test., April 7, 2014, 2:34 p.m. The parties apparently interpreted the concept of "pay directly" differently.

Mr. Metcalf testified that he understood that Mrs. Verbelia wanted to pay her son-in-law directly, i.e., contract directly with him and that Mr. Metcalf had not included the flooring in his bid. J. Metcalf Test., April 9, 2014, 3:05 p.m. The court does not find any writing in the contract that memorializes this agreement, and this issue of payment for the flooring was what ultimately brought construction to a halt. The contract is ambiguous because of the unchecked boxes related to a number of rooms where the hard wood or tile was installed. Flooring is only checked on "page two" for the hallway, bedrooms and bathrooms. Looking at the entire record, the court finds that Mr. Metcalf's proposal was for a fixed cost to build the house, and based on the testimony of Mrs. Verbelia and Mr. Morrison, the court finds that fixed price in the Agreement included flooring throughout the house up to $5.00 a square foot. However, neither party offered the court the number of square feet that were to be covered with the flooring. Mr. Metcalf did not prove that the flooring chosen exceeded the $5.00 a square foot limit or argue that he was entitled to charge an additional amount because of cost overruns.

### D.    The Construction and Changes

From the beginning, the "dream" was altered by reality. The original location for the

home was changed. Mr. Metcalf testified that the place Mrs. Verbelia had selected would have resulted in the front of the house being sixteen feet off the ground and therefore requiring a number of steps to get in the front door. J. Metcalf Test., April 9, 2014, 3:15-3:16 p.m. He suggested moving the building site to a less steep location where it would only require a few steps to get into the house. *Id.* at 3:16 p.m. Mr. Metcalf testified that this change was made with the Verbelias' consent, and they did not insist on the house being moved to a more level spot. *Id.* at 3:17 p.m. The basement was dug and the foundation begun. Mr. Verbelia testified that he could tell the house did not match the plans after the foundation was dug. R. Verbelia Test., April 8, 2014, 3:43 p.m. Despite both Verbelias now testifying that they could see problems from the beginning, they continued to work with Mr. Metcalf. B. Verbelia Test., April 8, 2014, 11:23-11:35 a.m.; R. Verbelia Test., April 8, 2014, 3:43 p.m.

When the first floor was installed, Mrs. Verbelia testified that the house was not the same as the plans, and she was required to go to the site and mark where all the walls would go. She testified that walls were changed which required window, door and closet placements to be changed because Mr. Metcalf did not work with the plans. B. Verbelia Test., April 8, 2014, 11:23-11:35 a.m.

Mr. Metcalf testified that there was never a "complete" set of plans for him to work from. J. Metcalf Test., April 7, 2014, 3:24 p.m. Mr. Metcalf did not explain what he believed a complete set of plans would include. He did testify that Mrs. Verbelia made numerous changes. *Id.* at 3:24-3:26, 3:34-3:44 p.m. The electrician and the plumber also testified to changes made to accommodate Mrs. Verbelia's wishes. Trial Testimony of Prentiss Wilkerson ("Wilkerson Test."), April 9, 2014, 10:09-10:12 a.m.; Trial Testimony of Tom Cohenouer ("Cohenouer Test."), April 9, 2014, 11:11-11:12 a.m.

14

One change in particular is important. The use of brick on the outside of the house became a point of contention. Mrs. Verbelia stated that she had specified a house with a brick exterior and that the Debtor wanted to put siding on the gables. B. Verbelia Test., June 10, 2014, 11:15 a.m. Mrs. Verbelia also requested brick columns on the front porch and on the back deck where Mr. Metcalf believed fiberglass columns should be used because brick would add too much weight and would not look right. J. Metcalf Test., April 9, 2014, 3:44 p.m.; June 6, 2014, 10:17 a.m. Mr. Metcalf refused to complete the brickwork in these areas. He told her she could hire the brick mason, Mr. Garcia, to take the brick up to the roof line, but that he was not doing it nor paying for it out of the contract price. *Id.* Mrs. Verbelia proceeded to have the work done by Mr. Metcalf's mason. *Id.* She also had Mr. Garcia brick a sun porch that had been added to the back of the house. *See* J. Metcalf Test., April 9, 2014, 3:41-3:46 p.m.; B. Verbelia Test., April 7, 2014, 3:01-3:03 p.m.; April 8, 2014, 9:43-9:46 a.m.

The parties agreed that a deck was added to the back of the house since the living space was so high off the ground on the back of the house. B. Verbelia Test., April 7, 2014, 3:57-3:58 p.m.; J. Metcalf Test., April 9, 2014, 3:36 p.m. The driveway into the side of the house was originally to be 3 feet high but, according to the Defendant, Mrs. Verbelia insisted that the level of the driveway be raised several feet to alleviate the risk of backing her car off the wall. J. Metcalf Test., April 9, 2014, 3:48-3:49 p.m. Mr. Metcalf warned her of the problems that such a high wall would have unless it was solid concrete. *Id. See also,* J. Metcalf Test., June 10, 2014, 10:16-10:17 a.m. Mr. Metcalf was out of money and he used fill dirt since he had not planned to add additional feet to the wall. The wall is leaning and shows significant cracks. Should the wall fall, the electrical box on the back of the house could be torn from the side of the house. Trial Ex. 13B at 4-5.

15

Mr. and Mrs. Verbelia testified that they made no changes to plans. B. Verbelia Test.,

April 8, 2014, 11:22 a.m.; R. Verbelia Test., April 8, 2014, 4:02-4:03 p.m. The court does not

find this to be credible. Mrs. Verbelia admits that she directed Mr. Metcalf's workers to correct

areas of construction that she did not feel were being constructed according to the plans and her

wishes. B. Verbelia Test., April 8, 2014, 11:23-11:35 a.m. Mrs. Verbelia admits that they

changed terms for the purchase of the flooring to provide for direct payment. B. Verbelia Test.,

April 7, 4:01-4:02 p.m. The actual payments differed from the payment schedule in the contract

which allowed for the payment of the contract in three installments. *See* Trial Ex. 3; Trial Ex. 9.

The court also finds that there was one writing evidencing a change. There are notations

on Mrs. Verbelia's version of the contract which reflected the Verbelias' agreement to pay for

the gravel driveway. Trial Ex. 23 at 2. The court also finds the testimony of the other

subcontractors who testified about additions and changes to be persuasive. While changes may

not be chargeable to the Verbelias under the terms of the Agreement without signed change

orders, they do offer an alternative explanation to fraud as to why the house was not finished in

April of 2008 and why the house was not finished for the quoted price.

As for the construction itself, the Verbelias offered the testimony of a home inspector,

Mr. Brogdon, who testified about various aspects of the house which were not completed in a

workmanlike manner. He offered pictures he had taken at the time Mr. Metcalf left the job in

2007 and pictures demonstrating how the residence looked in 2014. Trial Exs. 10 and 13. The

photographs from 2007 showed cracks around windows, poorly constructed deck stairs,

unfinished areas and openings left for the installation of windows and doors. Mr. Metcalf

admitted that many items were not completed and were left in unworkmanlike condition due to

the Verbelias' refusal to pay any more for the house. J. Metcalf Test., April 9, 2014, 3:39 p.m.,

16

3:49-3:51 p.m., Trial Exs. 10 and 13. One picture in the garage showed the insertion of wooden

shims to ensure contact between the post and floor joist. *Id.* at 4. There were also pictures of the

support for the first floor in the basement. Mr. Metcalf had installed wooden post supports which

the home inspector criticized. Trial Ex. 10 at 4-5. Mr. Cohenouer and Mr. Metcalf testified that

the problem in the flooring and support arose from the Verbelias' and Mr. Morrison's decision to

supplement the wood with steel posts. T. Cohenouer Test., April 9, 2014, 2:01-2:04 p.m.; J.

Metcalf Test., April 9, 2014, 3:21-3:24 p.m. Neither party offered a structural engineer to testify

about what was causing the problem with the floor support. There were also pictures of cracks on

the outside walls which Mr. Metcalf testified were caused by the weight of the additional brick

added by Mr. Verbelia. J. Metcalf Test., April 9, 2014, 3:44-3:46 p.m.; Trial Ex. 13.

      **E.**      **Accounting for the Construction Payments**

      On the day the Verbelias signed the Agreement, they provided Mr. Metcalf a down

payment of $20,000. R. Verbelia Test., April 7, 2014, 2:35-2:36 p.m. The parties stipulated that

the Verbelias paid Mr. Metcalf a total of $287,458.22. Trial Ex. 9. They had contracted to pay

him $298,000, plus $5,896 for the gravel driveway, which totaled $303,986. Of this amount,

$10,000 was paid in cash on August 31, 2006. *Id.* Although the Agreement provided for three

payments, the Verbelias made eleven payments, without complaint, according to Mr. Metcalf. In

late August 2007, the situation changed. *Id.* Around this time, Mr. Verbelia told Mr. Metcalf that

he would not give him any more money unless he had receipts showing how his money had been

spent. R. Verbelia Test., April 8, 2014, 3:00-3:03 p.m., 4:03-4:04 p.m.; J. Metcalf Test., April 9,

2014, 3:50-3:52 p.m.

      As the construction had progressed and the Verbelias advanced the purchase price, Mrs.

Verbelia had Mr. Metcalf acknowledge each payment on her copy of the contract. Trial Ex. 23.

As the amount advanced increased, Mrs. Verbelia became concerned that there was not enough money left under the Agreement to pay her son-in-law for the flooring and cabinets. B. Verbelia Test., June 10, 2014, 11:12-11:14 a.m.  Mr. Metcalf needed additional funds to complete the home. When the Verbelias began insisting on an accounting before further payments, he tried to resolve his financial difficulties by bringing six "proposals" to the Verbelias. Trial Ex. G; B. Verbelia Test., April 8, 2014, 9:48 a.m. These proposals required the Verbelias to pay additional sums for materials and labor. They refused, believing the proposals were for items included in the price in the Agreement. Trial Ex. G; B. Verbelia Test., April 8, 2014, 9:48 a.m. Mr. Verbelia testified that he refused to discuss the proposals with Mr. Metcalf on the basis that he was holding Mr. Metcalf to the contract that said he would provide a finished house for a fixed price. R. Verbelia Test., April 8, 2014, 3:03-3:05 p.m. Mr. Metcalf believed that he had spent the Agreement amount fulfilling the Verbelias' requests for extra items and needed additional funds to complete the residence. J. Metcalf Test., April 9, 2014, 3:49 p.m. At trial, the Verbelias provided proof of $287,458.22 in payments to Mr. Metcalf. Trial Ex. 9. The amount was $16,527.78 short of the agreed price of $303,986. Based on these facts, the court finds that $16,527.78 of the Agreement remained unpaid at the time Mr. Metcalf ceased work on the house.

On August 31, 2007, Mr. Metcalf, in one last effort to resolve his financial difficulties resulting from his failure to require change orders as the work progressed, delivered an accordion folder of receipts to the Verbelias. J. Metcalf Test., April 9, 2014, 3:50-3:52 p.m. He admits they were in no particular order and that he did not keep a copy of them. *Id.* at 3:52 p.m. The Verbelias describe the receipts as being delivered in a bag and that they were unable to make sense of them. They turned them over to their attorney and have not reviewed them. R. Verbelia

Test., April 8, 2014, 3:47-3:51 p.m.; B. Verbelia Test., April 7, 2014, 4:33 p.m.

At the trial, Mr. Metcalf went through his expenditures on the Verbelia job check by check. Trial Ex. B. He was able to account for $207,672.11 of the funds he received for the construction of the job. *Id*.[2]

By September 2007, the parties were at an impasse. The Verbelias were holding back funds to ensure the payment to their son-in-law and to complete the house, and Mr. Metcalf was refusing to go further without consent to his proposals which would have provided him with more funds. At this point both parties turned the matter over to their attorneys.

There was testimony regarding a representation related to the use of the $25,000 paid February 3, 2007. Trial Ex. 9; B. Verbelia Test., April 8, 9:34 a.m. Early in construction, Mr. Metcalf represented he had purchased two five ton air conditioning units for $5000 for the Verbelias. On February 3, 2007 he presented an invoice to the Verbelias for $15,800 which included $4000 for "heat." Trial Ex. E, at 2. Mr. Metcalf marked the invoice as paid. Later Mr. Danley, the HVAC contractor selected by Mr. Metcalf, brought the Verbelias proposals for the heat and air conditioning work. B. Verbelia Test., April 8, 2014, 9:34 a.m.; Trial Testimony of Michael Danley, April 8, 2014, 1:57 p.m. No funds had been paid to Danley Heat and Air. The Verbelias had to pay Danley $4700 after Mr. Metcalf left the job. Trial Ex. 14.

### F.    Breaches of the Contract

Plaintiffs allege that the Debtor "guaranteed all work and materials unconditionally for one (1) year and, further, warranted the products free of defects of workmanship or material; and that he would repair or replace, without charge to plaintiff, any defective part provided the defect

---

[2] This amount was determined by the court's review of the testimony related to Trial Exhibit B, which consisted of copies of checks from Mr. Metcalf's account and copies of check stubs from Mr. Metcalf's check book. The court has totaled all of the expenses paid which are attributable to the Verbelias' house and removed any duplicates. The accounting is attached as an appendix to this memorandum.

has not been caused by abuse or misuse." [Doc. No. 43, Plaintiff's Pretrial Brief, p. 3]. The court

finds no evidence of this warranty in Trial Exhibit 3 or 23. Plaintiffs contend that the Debtor

failed to abide by these obligations by using "unsuitable and defective materials" and performing

construction in a "careless, negligent and unworkmanlike manner." *Id.* They contend that he did

not build the house according to the home designer's specifications and failed to complete the

house within the seven months provided for in the Agreement. They proved that they paid him

$287,458.22, and that the Debtor walked off the site on September 1, 2007, leaving the

construction incomplete. *Id.*

### G.    Litigation

Mr. Metcalf's trial exhibits include a letter from his attorney dated August 31, 2007

alleging that the Verbelias owed him substantial sums on the construction of their residence.

Trial Ex. O. The letter states in part:

> It is my understanding the dispute concerns monies spent on your residence to
> date. Therefore I am enclosing copies of itemization schedules for your reference.
> Mr. Metcalf, based upon the itemization invoices, has advised he is owed
> $363,135.92 for all material and labor supplied to date. This amount does not
> include the passage doors, garage doors, finish electrical, trim & soffit and
> screened-in porch. Of this amount he has received a portion leaving an unpaid
> balance. At this time Mr. Metcalf has not calculated the total he has received on
> this project, but he estimates it to be between $220,000 and $240,000.
>
> It is my further understanding JM Construction and Remodeling will not return to
> the jobsite until the financial dispute is resolved.

*Id.* The proof does not support the contention that $363,135.92 had been spent on the Verbelia

home. The itemized schedules referenced in the letter were not introduced at trial. The proof

showed that only $207,672.11 was spent. As for payments, Mr. Metcalf had received

$287,458.22, not the $240,000 referenced in the letter. The court concludes that the fact that Mr.

Metcalf could not correctly calculate either amount and kept very poor records is a significant

factor in the breakdown between the parties.

**H.    Damages**

**1.    Cost to Complete**

The Plaintiffs catalog what they contend the Defendant failed to complete in their pre-

trial brief:

> On September 1, 2007, Defendant had not completed installation of exterior door
> frames and thresholds, electrical work, installation of light fixtures, and plumbing.
> Additionally, Defendant failed to complete work involving pillar and peak
> supports for the roof and porch; retaining walls; the kitchen cabinets and
> countertops; bathroom commodes, sinks, countertops and vanities; deck work and
> sunroom; driveway and garage doors; gutters, soffits and downspouts; installation
> of the heating and air conditioning units; interior painting; trim work; floor
> covering throughout the house; baseboards, closets and many other items.

[Doc. No. 43, Plaintiffs' Pretrial Brief, p. 4]. Mr. Verbelia gave his opinion that it would cost

$80,000 to repair the problems that existed related to the brick, concrete driveway, retaining

walls, stairs and to complete the screen porch. R. Verbelia Test., April 7, 2014, 3:18 p.m. They

also provided records of the work that they had done to complete the house to enable them to

move in. That amount was $150,212.78. Trial Ex. 14. No expert testimony regarding repairs was

offered.

**2.    Payment of Liens and Permits**

Plaintiffs contend that the Defendant did not acquire and pay for the appropriate permits

and failed to pay subcontractors even though he had received the funds from Plaintiffs to do so.

The Agreement executed by the parties does not require the contractor to pay for the appropriate

permits. Trial Ex. 3. Further, the permits listed in the Trial Exhibit 14 were obtained prior to the

execution of the Agreement. The court does not find there was an agreement to pay for the

permits.

As to the liens, the contract does require Mr. Metcalf to pay for all labor and materials.

Three subcontractors placed liens on the Verbelias' property for payments that should have been

made by the Defendant to the subcontractors pursuant to Tenn. Code Ann. § 66-11-138. Those

liens include the lien of Cantrell Carden Guttering for $8,361.57, Garage Door Services for

$4,439.00, and Tennessee Valley Ready Mix for $4,815.20. *See* Trial Ex. 19.  Although there

was a dispute as to the payment for flooring and cabinets, there was no dispute that these were

the responsibility of Mr. Metcalf.

### 3.        Payment of Rent

The Verbelias testified that they were forced to rent a home for more than a year while

they completed the house which was to have been finished in April of 2008. The rent for this

period was $11,200. Trial Ex. 14 at 6. They also incurred utility expenses at the rental unit in the

amount of $4,313.36. *Id*.

### I.        Mr. Metcalf's Counterclaim

Mr. Metcalf concedes that he held a license in the amount of only $150,000 and that he

did not finish the house. He also admits that he did not obtain any change orders for the

additional work that was required to make the changes requested by the Verbelias and that would

have made them responsible for those expenses. Nevertheless, he testified that the

representations he made about his experience were true and that he intended to build the house

for the amount he promised when he signed the Agreement. J. Metcalf Test., April 9, 2014, 3:08

p.m.; June 10, 2014, 9:15, 10:59-11:00 a.m. As for the amount of his license, he contends that

the Plaintiffs never asked about the amount and that he did not represent to them or to any

permitting authority that he had a license in an amount greater than $150,000. J. Metcalf Test.,

April 7, 2014, 2:01 p.m. He denies he intended to defraud the Plaintiffs. J. Metcalf Test., April 9,

2014, 3:08 p.m. He walked off the job when he could not get the Verbelias to pay him any more,

and he was financially unable to continue, although he believed he had made expenditures in

excess of the contract price of the house. *Id.* at 3:49-3:51 p.m. He asserts that his breach of

contract is insufficient to rise to the level of fraud. If the court agrees, he seeks his attorneys' fees

pursuant to 11 U.S.C. § 523(d). This section provides that

> [i]f a creditor requests a determination of dischargeability of a consumer debt under
> subsection (a)(2) of this subsection, and such debt is discharged, the court shall grant
> judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the
> proceeding if the court finds that the position of the creditor was not substantially
> justified, except that the court shall not award such costs and fees if special circumstances
> would make the award unjust.

11 U.S.C. § 523(d). The court finds that the debt owed to the Verbelias arises out of the

operation of the Debtor's business and is not a consumer debt. Because the debt in question is a

business debt, the court does not find that subsection (d) is applicable, and the court will dismiss

the counterclaim.

### J.    Bankruptcy Proceedings

Mr. Metcalf filed his voluntary Chapter 7 bankruptcy petition on June 12, 2012. [Bankr.

Case No. 12-12972, Doc. No. 1]. The Verbelias sued him in state court, but he filed his

bankruptcy petition prior to the state court entering a judgment. The first meeting of creditors

pursuant to 11 U.S.C. § 341 was scheduled for July 16, 2012. [Bankr. Case No. 12-12972, Doc.

No. 7]. The Plaintiffs timely filed their Complaint seeking an adjudication of the amount of the

debt owed to them and a finding that the debt is nondischargeable.

### II.    Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this

district provide this court with jurisdiction to hear and decide this adversary proceeding. *Hart v.*

*Southern Heritage Bank*, 564 F.App'x 773, 2014 WL 1663029 (6th Cir. April 28, 2014). The

Plaintiffs' action regarding the dischargeability of particular debts is a core proceeding. *See* 28

23

U.S.C. § 157(b)(2)(I).  Plaintiffs' other claims relate to the administration of the estate and the allowance or disallowance of claims under 28 U.S.C. § 157(b)(2)(A)-(B).

### III.  Analysis

### A.  Statute of Limitations

Mr. Metcalf raised the statute of limitations as an affirmative defense in his answer. Federal Rule of Bankruptcy Procedure 4007(c) requires that a complaint "to determine the dischargeability of a debt under § 523(c) shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a)." Fed. R. Bankr. P. 4007(c). It appears that the Plaintiffs filed the Complaint within the time period required by Fed. R. Bankr. P. 4007(c) as the first meeting of creditors was scheduled for July 17, 2012, and the Plaintiffs filed their Complaint on September 12, 2012.

With respect to any defense to the damage claims based on state law limitations periods, the Defendant announced that he was withdrawing those defenses at the pretrial conference held on March 28, 2014. Therefore, the court will not address the defense in the context of the Plaintiffs' claims.

### B.  Breach of Contract

Under Tennessee law a plaintiff alleging a breach of contract must demonstrate three elements: "(1) the existence of an enforceable contract; (2) non-performance amounting to a breach of that contract; and (3) damages caused by the breach." *Glass v. Northwest Airlines, Inc.*, 798 F.Supp.2d 902, 908 (W.D. Tenn. 2011). The district court in *Glass* further explained the recovery of damages for breach of contract:

> A plaintiff asserting a claim for breach of contract may recover damages that 'arise naturally' from the breach and that 'may reasonably be supposed to have been within the contemplation of the parties as a probable result thereof, or such as were reasonably foreseeable and within contemplation of the parties when they

entered into the contract.' '[A] party who [fails] to fulfill a contract cannot be held
liable for remote, contingent and uncertain consequences, or for speculative or
possible results which may have ensued from his breach.'

798 F.Supp.2d at 908 (quoting *Heim v. Town of Camden*, No. 02A01-9109CH00204, 1992 WL

1391, at *4 (Tenn. Ct. App. Jan. 8, 1992) and *Poynter v. Gen. Motors Corp.*, No. 3:06-CV-226,

2007 WL 3341923, at *3 (E.D. Tenn. Nov. 9, 2007)) (other citations omitted). In addition, "[t]he

purpose of assessing damages in a breach of contract action is to 'place the plaintiff, as nearly as

possible, in the same position he would have had if the contract had been performed.'"

*Consulting and Financial Servs., Inc. v. Friedmann*, No. M2011-00093-COA-R3-CV, 2012 WL

1390621, at *5 (Tenn. Ct. App. Apr. 19, 2012) (quoting *Wilhite v. Brownsville Concrete Co.,*

*Inc.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990)).

        As to the first element, the court finds that there was an enforceable contract for Mr.

Metcalf to build a house for $298,000 for the Verbelias, but the details are unclear. First, the

source of the details is in dispute. The California Contractors Agreement states that it is the

contractor's obligation to supply plans and specifications [Trial Ex.  3 at 4, Paragraph 2], but the

Verbelias' primary complaint is that Mr. Metcalf did not build their home pursuant to the plans

Mrs. Verbelia provided and that Ms. Bentley designed. The contents of Mrs. Verbelias' plans are

in dispute. A set of the plans which the Verbelias contend was used was not allowed into

evidence as a result of the Verbelias having failed to produce the plans on which they were

relying in their initial disclosures or at any time thereafter to Mr. Metcalf until the final pretrial

hearing. Had they been admitted, the court questions whether those plans would have been

determinative. Mr. Metcalf testified that he never had a final set of plans and that the drawings

he used were frequently changed. The Specifications which are part of the Agreement are not

helpful in filling in the details because half of the items listed are not checked or annotated. The

25

parties even disagree about whether the contract price included the flooring and cabinets.

Because of the lack of clarity in the contract and contradictory testimony at trial, a determination of the second element, nonperformance amounting to a breach, is also murky. At trial it was apparent to the court that both sides had had numerous discussions about how the building of the house was to progress and both sides believe that the other side agreed to terms which the other party is now disavowing. Having found neither side's current interpretation of the Agreement or their recollection of their conduct entirely credible, the court is left to ascertain what the Agreement was and whether it was breached. To do so, the court will have to consider parol evidence because the Agreement is ambiguous.

Tennessee law limits how much parol evidence may be admitted to alter the terms of a written contract. For example, in *GRW Enters., Inc. v. Davis*, the appellate court explained the use of parol evidence in interpreting contracts under Tennessee law:

> The parol evidence rule is a rule of substantive law intended to protect the integrity of written contracts. Since courts should not look beyond a written contract when its terms are clear, the parol evidence rule provides that contracting parties cannot use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract.
> The rule appears to be quite all-encompassing. However, the courts have been reluctant to apply it mechanically and have now recognized that it has numerous exceptions and limitations. Thus, the rule does not prevent using extraneous evidence to prove the existence of an agreement made after an earlier written agreement, or to prove the existence of an independent or collateral agreement not in conflict with a written contract. In each of these circumstances, the courts have conceived that the parol evidence is not being used to vary the written contract but rather to prove the existence of another, separate contract.
> The courts have also recognized certain circumstances that permit contracting parties to vary or to circumvent the plain terms of their written contract. Thus, the parol evidence rule does not prevent using extraneous evidence to prove that a written contract does not correctly embody the parties' agreement, or to prove estoppel or waiver.

797 S.W.2d 606, 610-11 (Tenn. Ct. App. 1990) (citations omitted). Further, "Tennessee law 'does not require ambiguity when certain defects in the formation of the agreement are

demonstrated; parol evidence can be admitted to contradict or vary the terms or enlarge or

diminish the obligation of a written instrument upon a showing of fraud.'" *Shah v. Racetrac

Petroleum Co.*, 338 F.3d 557, 567 (6th Cir. 2003) (quoting *Cincinnati Ins. Co. v. Avery*, No. 89-

5536, 1990 WL 132245, at *3 (6th Cir. Sept. 12, 1990) (unpublished)).

Tennessee courts have explored claims for breaches of construction contracts and have

examined the intrinsic obligations of a builder in fulfilling the terms of such an agreement:

> It is well settled that a contract for the construction of a building carries implied
> warranties against defects and that the construction will be accomplished in a
> workmanlike manner:
>
>> A contract to construct an entire building is essentially a contract
>> for material and labor, and includes an implied warranty protecting
>> the owner from defective construction. Once a builder undertakes a
>> construction contract, the common law imposes upon him or her a
>> duty to perform the work in a workmanlike manner, and there is an
>> implied agreement that the building or work performed will be
>> sufficient for the particular purpose desired or to accomplish a
>> certain result. Thus, a failure to perform a building contract in a
>> workmanlike manner constitutes a breach of the contract.

*Bowling v. Jones*, 300 S.W.3d 288, 291 (Tenn. Ct. App. 2008) (quoting 13 Am.Jur.2d *Building

and Construction Contracts* § 10 (2000)). Further, "the abandonment of a contract gives rise to a

cause of action for breach." *Bowling*, 300 S.W.3d at 293.

After considering the testimony at trial regarding the parties' discussions after the

execution of the Agreement, the court finds that the Verbelias expected to have an inhabitable

home for $298,000. They expected to pay extra for the gravel drive and for flooring if it

exceeded $5.00 a square foot. They expected the work to be done in a workmanlike manner and

to be free from defects. With respect to a completed home and the quality of workmanship, they

did not get that. From the proof presented, the court concludes that at the time Mr. Metcalf left

the job, there were many defects which are attributable to poor workmanship or the Defendant's

departure before completion. D. Brogdon Test., April 8, 2014, 4:26-5:39, April 9, 2014, 9:17-
9:41 a.m. His abandonment of the project is, in and of itself, a breach of the Agreement.
*Bowling*, 300 S.W.3d at 293.

Mr. Metcalf raises several defenses to these claims. Mr. Metcalf admitted that there were
pictures of unworkmanlike construction such as the deck stairs and uncovered outlets, but he
contends that such defects were due to his termination of the work rather than the work being
done poorly. He contends that he expected that they would pay him more if changes were made
which required more labor or material expense. The California Contract Agreement supports this
understanding. Trial Ex. 3 at 3, California Contractor Agreement, Article 5. He argued at the
hearing that he was justified in stopping because the cost of the house greatly exceeded the
contract price. Mr. Metcalf's defense suffers from the same failure of proof the Verbelias' repair
claim has. The court does not have a set of the original specifications or plans to see how the
work that was done before Mr. Metcalf quit was more than what he bargained for. He did not
offer his budget to show where he had overspent. In fact, Mr. Metcalf did not prove that he had
spent more on the house than he had been paid. While not expressly stated, his defense is that
completion of the house was excused by the changes made by Verbelias, the additional costs
those changes necessitated, and their unconscionable conduct in refusing to discuss his proposals
for a price increase. The court rejects this defense. He was paid more than he spent on the house,
and he failed to obtain written consent to changes as the project progressed. The court therefore
finds that he breached the contract, and that the breach was not excused.

That leaves the third element for a successful claim for breach of contract, the amount of
damages caused by the breach. One measure of damages is the cost of bringing the existing
structure up to the quality of the structure anticipated by the contract, but there is no clear

evidence of what was anticipated. Mr. Verbelia testified that $80,000 would be the cost to repair

or rebuild their residence as it now stands. Mr. Metcalf did not dispute that amount.

Another measure of damages when a contractor fails to complete a construction project

is the difference between the contract price and the cost of finishing the work according to the

contract. *Bowling*, 200 S.W.3d at 295 (citing *Harley v. Harrison*, No. M2005-02099-COA-R3-

CV, 2006 WL 2644372 (Tenn. Ct. App. Sept. 13, 2006)); *see also, Rhea v. Marko Const. Co.*,

652 S.W.2d 332, 333 (Tenn. Sup. Ct. 1983); *Brady v. Oliver*, 147 S.W. 1135, 1141-42 (Tenn.

Sup. Ct. 1911). There was clear proof of the amount required to finish the house so that the

Verbelias could move in. The amount remaining on the Agreement which was not paid is also

certain. There should also be an additional adjustment for amounts spent to finish the house

which were not contemplated by the parties in the Agreement such as cost overruns on the

flooring. The amount spent to make the house habitable was $150,212.78. Trial Ex.14. Mr.

Metcalf argued that these expenses should be questioned because they were payments made to

related parties. Mr. Metcalf challenged only the portion of this amount that was paid to Mr.

Morrison, Mr. Morrison's son and Tile Trends. Tile Trends received $47,223 of the amount for

materials and labor. Trial Ex. 14. The court does not agree that payments to related parties are

disqualified from inclusion in the damages. Mr. Metcalf did not show the court that the work had

not been done or that the materials were not delivered. The court will give the Verbelias credit

for these expenditures just as the court is giving Mr. Metcalf credit for expenditures he made on

the house that were paid his family members who were working as part of his crew.

Mr. Metcalf also challenged the amounts paid to Tile Trends on the basis that Ms.

Verbelia had agreed to pay those expenses directly and that they were not included in his bid

price. J. Metcalf Test., April 9, 2014, 3:04-3:06 p.m. The court finds the testimony of Mr.

Morrison and Mrs. Verbelia regarding the $5.00 budget to be persuasive that the parties did

intend to include flooring in the Agreement price, at least to the extent of $5.00 a square foot.

The court cannot tell from the evidence whether this budget was exceeded. Mr. Metcalf did not

challenge the amount required to finish the house on this basis that he was entitled to more

money because of flooring choices. Therefore, the court will not reduce the damages based on

flooring cost overruns. The other expenses for completing the house appear to be appropriate

charges and included payments to the plumber, electrician, laborers, and the cabinet supplier. *See*

Appendix A. In summary, the court finds that there was a breach of the parties' Agreement and

there were damages attributable to the failure to finish the house of $150,212.78.

In addition to the costs of completion, there is $80,000 worth of repairs that need to be

done. That brings the damages to $230,212.78. From that should be subtracted the Agreement

price that was not paid, which is $16,527.78. *Supra*, at p. 18. Accordingly, the court finds that

damages related to construction are $213,685.00.

The Verbelias also claim damages for breach of the contract based on the house not being

completed on time. They seek $11,200.00 in rent from April 2007 to May 2008. Trial Ex. 14.

Mr. Metcalf responded that the delays in completion were caused by changes made by the

Verbelias that delayed completion, but Mr. Metcalf did not specify how long each change

delayed the construction. The court notes that the California Contractor Agreement allows the

contractor to suspend work if a payment is not made, but the date on which Mr. Metcalf stopped

work was after the agreed upon completion date had already passed. The Agreement is not

specific as to the date the final payment must be made. Trial Ex. 3 at 4. The court finds that the

Agreement required the house to be completed by April 2007. Mr. Metcalf failed to do so, and

the additional rental costs were $11,200. The court will therefore allow the Plaintiffs an

30

additional $11,200 in damages for the breach of the Agreement to complete the house by April

2007. For the same reason, the court will also award damages in the amount of $4,373.36 for

utility expenses. The contract also provided that Mr. Metcalf would pay for labor and materials.

Finally, there are three liens that have been filed against the property which remain unpaid.  They

total $17,615.77. Therefore, the total amount of damages relating to the Plaintiffs' breach of

contract claim is $246,874.13.

The Verbelias ask the court for their attorney's fees. The Agreement does not provide for

the payment of attorney's fees. Trial Ex. 3 The court will therefore not award any attorney's fees

based on the Agreement.

### C.      Misrepresentation

The Plaintiffs also seek a determination that their claim for damages is nondischargeable.

Section 727 provides for the discharge of an individual from any specific debt unless that debt is

excepted from discharge pursuant to 11 U.S.C. § 523. 11 U.S.C. § 727(a)-(b). A creditor

objecting to the dischargeability of his debt must prove by a preponderance of the evidence that

its debt is non-dischargeable under 11 U.S.C. § 523. *See Grogan v. Garner*, 498 U.S. 279, 287,

111 S.Ct. 654, 659 (1991). Exceptions to discharge are narrowly construed in the debtor's favor.

*See Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th Cir. 2004).

The exception to dischargeability on which the Verbelias rely is found in 11 U.S.C. §

523(a)(2)(A). That provision prohibits discharges of debt based on "false pretenses, a false

representation, or actual fraud, other than a statement respecting the debtor's or an insider's

financial condition; . . ." The Sixth Circuit has held that to demonstrate nondischargeability for a

misrepresentation pursuant to 11 U.S.C. § 523(a)(2)(A), a creditor must prove four elements:

> (1) the debtor obtained money through a material misrepresentation that, at the
> time, the debtor knew was false or made with gross recklessness as to its truth; (2)

31

the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the
false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir.

1998).

An objection to dischargeability may also be based on something broader than a specific

statement by the debtor. In *In re Vitanovich* the Sixth Circuit Bankruptcy Appellate Panel

addressed the meaning of "actual fraud" within the context of § 523(a)(2)(A):

> We adopt the position of the Court of Appeals for the Seventh Circuit that actual
> fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and
> misleading omissions. When a debtor intentionally engages in a scheme to
> deprive or cheat another of property or a legal right, that debtor has engaged in
> actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code.

*Mellon Bank v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (citing

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)).

**1.    The Misrepresentations**

The Verbelias identify a number of oral and written statements made by the Debtor which

they contend were: (1) false, (2) made intentionally to mislead the Verbelias, and (3) on which

the Verbelias reasonably relied. With respect to the fourth element, they also contend that their

reliance on those statements proximately caused their damages. The court will discuss each

statement in turn. Only if the Verbelias have proven all four elements will the court find the

resulting damages to be nondischargeable.

**a.    Mr. Metcalf represented that he was a licensed contractor.**

First, the Verbelias allege that Mr. Metcalf misrepresented that he was a "licensed

contractor." There is no evidence that Mr. Metcalf stated orally or in writing that he held a

license sufficient to build a $298,000 residence; nevertheless, the court finds that he made an

incomplete statement which was misleading. He did claim to be a licensed contractor, even

though he knew, or should have known, that he was limited to entering into construction

contracts for $150,000 or less. He knew that the Verbelias planned to build a house valued in

excess of $150,000. He made a proposal to build a house for $298,000. He was aware that he

could not have obtained a building permit for the project with his license; however, the

deficiency in his license was not discovered at the point of permitting because the Verbelias had

previously obtained the building permit and listed themselves as the contractor.[3]

The fact that Mr. Metcalf did not obtain the permit does not make his statement any less

misleading. In the case of *In re Heinz*, Judge Parsons considered a similar situation in which a

builder was never licensed in an amount sufficient to build a house of the size contemplated in

the Agreement. *Forsyth v. Heinz (In re Heinz)*, No. 11-5009, 2012 WL 137563, at *3 (Bankr.

E.D. Tenn. Jan. 18, 2012). The court found that a representation by a contractor that he was

"licensed" when his license was inadequate for the contract into which he was entering was a

material misrepresentation. In that case she notes that:

> "For purposes of [11 U.S.C. § 523(a)(2)(A), false pretenses and false representations
> 'encompass statements that falsely purport to depict current or past facts.'. "'False
> pretense' involves implied misrepresentation or conduct intended to create and foster a
> false impression as distinguished from a 'false misrepresention' which is an express
> misrepresentation."

*In re Heinz,* 2012 WL 137563, at *5 (quoting *Haney v. Copeland (In re Copeland)*, 291 B.R.

740, 760 (Bankr. E.D.Tenn. 2003) (citing *Peoples Sec. Fin. Co. Inc. v. Todd (In re Todd),* 24

B.R. 633, 635 (Bankr. W.D. Ky. 1983) and *Ozburn v. Moor (In re Moore)*, 277 B.R. 141, 148

(Bankr. M.D. Ga. 2002)). As to materiality, she noted that a fraudulent and material

misrepresentation is a "substantial inaccuracy of a type which would generally affect" a party's

decision. *Id.* at *6 (quoting *In re Copeland*, 291 B.R. at 761). The court agrees with Judge

---

[3] There is a provision in Trial Exhibit 1 requiring the contractor to obtain the permits; however, that page is not
included in the Exhibits that evidence the parties' agreement. Trial Exs. 3 and 23.

Parsons in *In re Heinz* that a representation regarding licensure is material. The limitation on the

license amount reflects more than just the amount for which a contractor may contract; it is also

an indicator of the contractor's expertise, experience and financial strength. The court finds that

Mr. Metcalf made a material misrepresentation to the Verbelias when he said he was a licensed

contractor.

The elements of intent and reliance are not so clear. The second element for a successful

objection to dischargeability is intent to deceive, and this element is measured by a subjective

standard. *In re Rembert*, 141 F.3d at 281 (citing *Field v. Mans*, 516 U.S. 59, 70-72, 116 S.Ct.

437, 444 (1995)). Intent to deceive a creditor exists "'when the debtor makes a false

representation which the debtor knows or should have known would induce another to advance

goods or services to the debtor.'" *In re Copeland*, 291 B.R. at 765-66 (quoting *Bernard Lumber*

*Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D.Ohio 2001)). "What courts need to

do is determine whether all the evidence leads to the conclusion that it is more probable than not

that the debtor had the requisite fraudulent intent." *In re Rembert,* 141 F.3d at 282 (quoting

*Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 334 (Bankr. N.D. Ill. 1995)).

The intent may be inferred from the totality of the circumstances. *In re Copeland*, 291 B.R. at

766.

The Verbelias asked Mr. Metcalf about his license. He knew it was important to them,

and his statement that he was licensed left them with the impression that he held a license

sufficient to enter into a contract to build a house of the value stated in the Agreement.  He offers

as evidence of his lack of intent that he did not think the amount was important because the

Verbelias were acting as their own contractor based on the fact that they had already obtained the

permits. He has rationalized that he did not need to disclose the limitation because the building

permit had already been obtained.

If these were the only facts in the case, the court would follow *In re Heinz* and find intent.

However, there are additional facts present here that were not present in the *Heinz* case. Mrs.

Verbelia testified that he showed them his license. B. Verbelia Test., April 7, 2014, 2:57 p.m.

The plaintiff in *Heinz* testified that she never saw the license. *In re Heinz*, 2012 WL 137563 at

*8. In addition, the plaintiff in *Heinz* testified about specific conversations regarding the license

verification and assurances from the contractor that his license was "no problem." The *Heinz*

contractor's letterhead noted that his license status was "Active-Fully Licensed." *Id*. at *9. Mr.

Metcalf showed her his license. In addition, Mr. Metcalf did not go seeking the job, nor did he

ask the Verbelias to obtain the permit so his limitation would not be discovered. Even if the

statement about being a licensed contractor was misleading, these additional facts, while not

negating the misrepresentation, make this case distinguishable from *Heinz* as to intent. The court

does not find that Mr. Metcalf made the misrepresentation with the intent to defraud the

Verbelias.

The third element, justifiable reliance, is also determined by a subjective standard.  *In re

Heinz*, 2012 WL 137563 at *9.  This requires a showing that the creditor actually relied on the

misrepresentation and that the reliance was justifiable. *In re Copeland,* 291 B.R. at 766-67. The

Verbelias claim that they would never have signed the Agreement with an inadequately licensed

contractor. The court does not find that the Verbelias have carried their burden on this element

either.

In addition to seeing the license, the court finds that there was substantial reliance placed

in the recommendation of a family member rather than on the statement that Mr. Metcalf was a

"licensed contractor." The Debtor was sent to them by their son-in-law in whom they place great

trust. Their son-in-law completed the house, but he is not a licensed contractor. They went to see

other houses. The court also considered that the Verbelias both testified that they rejected the

other contractor because he would not give them a fixed bid, and they liked the fact that Mr.

Metcalf would. Although they testified that they were concerned with how Mr. Metcalf was

conducting his business from the very beginning, they continued to work with him. Because the

court finds that the Verbelias relied on other factors and disregarded the license itself, they have

not proven reliance. Therefore, the court does not need to determine whether damages arose

because of this misrepresentation.

      **b.**      **Mr. Metcalf represented that he was an expert builder.**

      The next misrepresentation involves Mr. Metcalf's statements that he was an "expert

builder." Mr. Metcalf did not deny that he made this representation and stood by his statement at

trial. The court finds that the Debtor was experienced in remodeling and roofing. He had

obtained a license to build residences up to a value of $150,000, and he had worked on other

houses, at least one of which the Verbelias inspected themselves. Nevertheless, the pictorial

evidence presented at trial does not reflect what the average consumer would consider "expert"

construction.  Trial Exs. 10 and 13. The photographs show numerous incidents of cracks and

"unworkmanlike" carpentry and masonry. D. Brogdon Test., April 8, 2014, 4:26-5:39 p.m., April

9, 2014, 9:17-9:41 a.m.  Based upon the testimony of the home inspector regarding the

unworkmanlike construction, the Debtor's problems with managing the construction costs, and

change orders involved in a custom house of this size, the court finds that the Debtor's

representation that he was an expert builder qualified to build the house was a misrepresentation.

This is further supported by the Tennessee Board of Licensing's denial of a license in excess of

$150,000. Trial Ex. 22. At a minimum, he made those statements with reckless disregard for the truth. The element of a material misrepresentation has been proven.

With respect to the second element of intent, the circumstances in this case do not indicate that Mr. Metcalf intended to deceive the Verbelias. He testified that he believed that he could build the house, and the other houses he showed them led the Verbelias to agree with him. The court is not convinced that he knew he was making a false statement when he made the "expert builder" statement. When he met with them, he showed them other projects he had worked on that were of a similar value. There was no evidence that the houses he showed them were not his and his crew's work. His explanation for the condition of their house was that it was not finished and that he could not finish it without more money. There were other problems that he acknowledges were problems in the construction, but he attributed those problems to decisions made by the Verbelias or people they had employed to work on the house after he left the job. On the stand he testified that he had no intent to defraud them, and the court finds his explanation of the construction problems and his financial difficulties to be credible.

The Verbelias also failed to convince the court that they relied on this statement. There were instances when Mr. Metcalf did offer his "expert" advice, and it was rejected. For example, the porches, to the extent that they were included in the design, were also made heavier by the installation of the brick on all exterior surfaces, including the porch columns, despite the Debtor's advice against use of that material. Mrs. Verbelia also ignored his advice on the installation of the driveway. The retaining wall by the driveway into the garage now has substantial problems, but the Debtor testified that he informed Mrs. Verbelia that there would be a problem when it was built.

If the Verbelias did rely on Mr. Metcalf's characterization of his expertise, the court does not find that they proved damages arising from this misrepresentation. Many of the problems with the house relate to cracks and gaps in the walls and porches. There was no expert qualified to testify about what caused the cracks. That house as designed had concrete block walls, not solid concrete walls, which were installed at the Verbelias' request after the design was drawn. The Verbelias admit that they asked for the heavier blocks without consulting their designer. To the extent that the problems arise from the change in the design made by the Verbelias, not the installation of the materials, the court does not find that a representation about building expertise is also a representation regarding the design.

**c.      Mr. Metcalf had a qualified construction crew.**

Another misrepresentation cited by the Plaintiffs is Mr. Metcalf's statement that he had a qualified construction crew of seven. The court does not find this to be a misrepresentation. There was a crew with whom he had worked before. The crew included family members who had personal problems, and they may not have been the professionals working only on their house every day that the Verbelias imagined. However, there was a crew, and they did work regularly on the Verbelias' home during the construction period. The court does not find that the Verbelias have proven that this representation was false.

**d.      Mr. Metcalf agreed to build a house like the plans.**

The next misrepresentation claimed by the Verbelias is that Mr. Metcalf agreed to build the house in accordance with the plans and specifications. There is conflicting testimony about whether there was ever one set of plans and specifications on which both parties agreed. No plans or specifications were introduced at the trial, so it is impossible for the court to determine whether the house was built in accordance with the alleged specifications.

38

To the extent that specific aspects of the plans were discussed at trial, the court does not find that the Verbelias reasonably relied on the representation that the house would be built to conform to those characteristics. The home designer testified that the home was supposed to be a one-level house on a gently sloping lot. J. Bentley Test., June 10, 2014, 2:01, 2:06-2:07 p.m. The Verbelias approved the building site after Mr. Metcalf suggested moving it because the slope of the original site they had selected was too steep. There was no testimony that the Verbelias went back to the home designer to check to see what the maximum slope of the lot should be to maintain the integrity of their concept of a "one-level" house.

The Verbelias stated that the house was bigger than the plans, although no specific dimensions were offered at trial for what the house was supposed to be and what it ended up being.  Mr. Verbelia testified that he had problems with Mr. Metcalf from the beginning when he saw the foundation but admitted he did not complain at that time. R. Verbelia Test., April 8, 2014, 3:40-3:43 p.m.

There was also the issue of the view of a lake from the house. Mr. Metcalf perceived that a view of the lake was more important to the Verbelias while the Verbelias testified at trial that they wanted a one-level house with one step to get inside the house. The court has trouble reconciling this claim of the supreme importance of a "one-level" house with the reality of one built on a hill on a site they approved to maintain their view. It appears that the Debtor made them aware that changes would be necessary beginning at the time of the site selection. Because it is the Verbelias' burden of proof to show that they reasonably relied on the specifics about a one-level house, and that burden has not been carried, the court finds that debts arising from the failure to comply with the plans and specifications are dischargeable.

**e.    Mr. Metcalf represented that the house would cost $298,000 and would be finished by April 2007.**

The next alleged misrepresentations are statements in the Agreement related to the price and time of completion. The California Contractor Agreement states that a house will be built in accordance with the plans and specifications for $298,000 and that it will be completed by April 1, 2007. Trial Ex. 3. While the house now existing on the Verbelias' property was not completed for the stated price of $298,000 or by April 1, 2007, the Verbelias must prove that the Debtor knew that those statements were false at the time he made them and that he intended to make those statements to defraud the Verbelias. The court does not find that the Verbelias have carried their burden of proof as to these elements.

Mr. Metcalf testified that he believed he could build the house for that amount and that he could complete the house within the nine months he proposed. His explanation of his failure to do so related to events that occurred after the execution of the Agreement. He contends that the reason the cost and the time limits were exceeded were because of changes made by the Verbelias. The Verbelias testified that there were no changes made to the plans, but then Mrs. Verbelia testified about going to the property to lay out the walls because the house had been changed so much that the wall on the plans would no longer work. She overrode the Debtor's recommendation about bricking the porch and the gables. She changed windows. She added lights. She insisted that the driveway be raised to make it less steep. While Mr. Metcalf's explanation is not sufficient to excuse the damages the court awarded for breach of contract, it is sufficient to satisfy the court that the representation was not made with intent to defraud the Verbelias at the time the Agreement was executed.

40

### f.    Mr. Metcalf represented that he would  pay for all labor and materials.

In the Agreement Mr. Metcalf promised to pay for all of the materials and to pay all of

the subcontractors.  Trial Ex. 3. He clearly breached that promise. There are three liens against

the house, and the Verbelias spent more than $150,000 to complete the house. However, the

Verbelias have the burden to show that the Debtor made representations to them with the intent

to take their money and never pay the subcontractors. The Verbelias offered proof that they paid

over $287,000 to the Debtor and that the Debtor has not explained what he did with that money.

They showed that he was working on other jobs while he was working on their job and that some

of those checks may have been for other jobs.

The Debtor never represented that he would segregate their funds. In fact, Mr. Verbelia

testified that he requested that his payments be segregated. R. Verbelia Test., April 18, 2014,

2:42-2:43 p.m. Although Mr. Verbelia testified that the Debtor agreed initially, he later refused

to do so, telling the Verbelias that it was "too much trouble." *Id.* With one exception, there was

not a clear correlation between Mr. Metcalf's request for funds and specific expenses.

Like many of the other misrepresentations alleged by the Verbelias, the court does not

find that the element of fraudulent intent has been proven.  Mr. Metcalf did pay subcontractors

and materialmen approximately $207,000. He testified that he ran out of money to pay the rest.

The court found the Debtor's testimony regarding his checking account and his reasons for

thinking that a particular check was paying for service or materials for the Verbelias' job to be

very credible. The problem arises from Mr. Metcalf's recordkeeping. When all of Mr. Metcalf's

checks are added together, they total only $207,672, not $287,000 which both parties stipulate is

the amount that Mr. Metcalf received. But this is not an objection to discharge based on failure to

explain the loss of assets or failure to keep records. The issue is fraud and misrepresentation, and

this representation is a statement printed provision in a form used for the parties' Agreement executed in July of 2006. The court does not find that the Verbelias proved Mr. Metcalf had that intent in July of 2006.

The one exception is $4000 for the heat and air conditioning. Mr. Metcalf represented to Mrs. Verbelia that he had bought two air conditioning units in February of 2007 because they were "such a good price." He represented that he needed funds to purchase two air conditioning units for the house early in the construction process. B. Verbelia Test., April 7, 2014, 4:56 p.m.; April 8, 2014, 9:33-9:34 p.m.; Trial Ex. 14. Mrs. Verbelia later paid for an air conditioning unit. The air conditioning subcontractor has no record of ever receiving the $4000. Trial Testimony of Michael Danley ("Danley Test."), April 8, 2014, 2:01 p.m. While it appears that sufficient funds were paid on February 3, 2007 to Mr. Metcalf to pay this subcontractor $4000, Mr. Metcalf failed to do so. The Debtor provided no explanation to negate a fraudulent intent regarding what happened to the $4000 or the air conditioning units. The court finds that the representation about the purchase and receipt of $4000 are proof of a misrepresentation. The Verbelias relied on that representation to their detriment. That reliance resulted in the Verbelias paying an additional $4000. The court will enter a nondischargeable judgment in the amount of $4000, which represents the amount of funds requested but not used in accordance with the representation by Mr. Metcalf.

### g.    Fraudulent inducement to contract

The Verbelias claim that Mr. Metcalf fraudulently induced them to enter into the Agreement. A claim of fraudulent inducement or promissory fraud under Tennessee law requires: "(1) an intentional misrepresentation of a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) an injury caused by reasonable

reliance on the statement; and (4) a promise of future action with no present intent to perform."

*Hood Land Trust v. Hastings*, No. M2009-02625-COA-R3-CV, 2010 WL 3928647, at *7 (Tenn.

Ct. App. Oct. 5, 2010) (quoting *Houghland v. Houghland*, No. M2005-01770-COA-R3-CV,

2006 WL 2080078, at *3 (Tenn. Ct. App. July 26, 2006)).

Based on the evidence presented, the court concludes that the Plaintiffs have not carried

their burden of proof as to fraudulent inducement based on the court's prior findings regarding

intent.

### D.   Breach of Warranty

Plaintiffs also allege a claim for breach of contractual warranty and the implied warranty

of good workmanship. The Agreement states that "[a]ll work shall be completed in a workman-

like manner and in compliance with all building codes and other applicable laws." Trial Ex. 3, p.

4.

The Tennessee Supreme Court has also established a cause of action for breach of an

implied warranty where the contract is silent on the issue of warranty; however, "[b]uilder-

vendors and purchasers are free to contract in writing for a warranty upon different terms and

conditions or to expressly disclaim any warranty." *Dixon v. Mountain City Const. Co.*, 632

S.W.2d 538, 542 (Tenn. Sup. Ct. 1982). The Tennessee Supreme Court adopted an implied

warranty described by the North Carolina Supreme Court in *Hartley v. Ballou*:

> "[w]e hold that in every contract for the sale of a recently completed dwelling,
> and in every contract for the sale of a dwelling then under construction, the
> vendor, if he be in the business of building such dwellings, shall be held to
> impliedly warrant to the initial vendee that, at the time of the passing of the deed
> or the taking of possession by the initial vendee (whichever first occurs), the
> dwelling, together with all its fixtures, is sufficiently free from major structural
> defects, and is constructed in a workmanlike manner, so as to meet the standard of
> workmanlike quality then prevailing at the time and place of construction; and
> that this implied warranty in the contract of sale survives the passing of the deed
> or the taking of possession by the initial vendee."

*Dixon*, 632 S.W.2d at 541 (quoting *Hartley v. Ballou*, 209 S.E.2d 776, 783 (N.C. Sup. Ct.

1974)). Other Tennessee courts have found that certain language, such as promises to construct a

home in a "good workmanlike manner," is sufficient to provide an express warranty and negate

any implied warranty. *See e.g., Consulting and Financial Servs., Inc. v. Friedmann*, No. M2011-

00093-COA-R3-CV, 2012 WL 1390621, at *3 (Tenn. Ct. App. Apr. 19, 2012) (finding promise

to construct in "good, workmanlike manner" was sufficient to negate implied warranty and

undertaking de novo review to determine whether express warranty had been breached). It

appears in this case that the parties contracted for an express warranty based on the language in

the Agreement pertaining to completion in a "workmanlike manner."

In this adversary proceeding the court concludes that there was evidence presented that

the work was not done in a workmanlike manner, but there was conflicting evidence as to parts,

whether it was done at the direction of the Verbelias or as a part of the work they did to finish the

house. The only proof regarding the cost to make the repairs for those defects which remain was

Mr. Verbelia's testimony regarding $80,000 which is already included in the contract damages.

Therefore, the court finds that Mr. Metcalf breached his warranty, but the Plaintiffs have not

demonstrated any damages other than those awarded for the breach of the Agreement.

### E.    Breach of the Covenant of Good Faith and Fair Dealing

With respect to the Plaintiffs' alleged claim for breach of the covenant of good faith and

fair dealing, "Tennessee law does not recognize such a claim as 'a cause of action in and of

itself.'" *First Tennessee Bank Nat. Ass'n v. Republic Mortgage Ins. Co.*, 276 F.R.D. 215, 220

(W.D. Tenn. 2011) (quoting *Lyons v. Farmers Ins. Exchange*, 26 S.W.3d 888, 894 (Tenn. Ct.

App. 2000)). Instead, such a claim is "part of a breach of contract cause of action." *Lyons*, 26

S.W.3d at 894. Under Tennessee law, " 'there is implied in every contract a duty of good faith

44

and fair dealing in its performance and enforcement.' However, '[b]reach of the implied

covenant of good faith and fair dealing is not an independent basis for relief.'" *Thomas v.*

*Meharry Medical College*, 1 F.Supp.3d 816, 829 (M.D. Tenn. 2014) (quoting *Dick Broad. Co.,*

*Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. Sup. Ct. 2013) and *Shah*, 338

F.3d at 572). *See also Tomlin v. Crownover (In re Crownover)*, 417 B.R. 45, 54-55 (Bankr. E.D.

Tenn. 2009).

Accordingly, this claim will be dismissed as a separate claim.

## F.      Defective Design or Construction

The Verbelias also assert a claim of defective design or construction. Although not

articulated by them  in these terms, this claim is essentially one of common law negligence in the

design or construction of their home. Tennessee courts have explained:

> No claim for negligence can succeed in the absence of any one of the following
> elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct
> falling below the applicable standard of care amounting to a breach of that duty;
> (3) an injury or loss; (4) causation in fact; and (5) proximate cause, or legal cause.

*Jenkins v. CSX Transp., Inc.*, 906 S.W.2d 460, 463 (Tenn. Ct. App. 1995). Further, "[w]hether

the defendant owes a duty to the plaintiff is entirely a question of law for the court to determine

by reference to the body of statutes, rules, principles and precedents which make up the law." *Id.*

The home was designed by someone other than the Debtor so the court will address only

construction.

In an action for negligence based on construction, Tennessee courts have looked to the

"applicable standard of care" to determine whether a breach of duty has occurred. *See Ames v.*

*Phillips Builders, Inc.*, No. 01A01-9701-CV-00043, 1997 WL 718433, at *3 (Tenn. Ct. App.

Nov. 19, 1997). In discussing the differences between a claim for negligence in residential

construction and a claim pursuant to implied warranty, one Tennessee court quoted with

approval an explanation given by the Colorado Supreme Court:

> Some overlap in elements of proof of such actions may occur, but the scope of duty differs and the basis for liability is distinguishable. The implied warranty of habitability and fitness arises from the contractual relation between the builder and the purchaser. Proof of a defect due to improper construction, design, or preparation is sufficient to establish liability in the builder-vendor. Negligence, however, requires that a builder or contractor be held to a standard of reasonable care in the conduct of its duties to the foreseeable users of the property . . . Negligence in tort must establish defects in workmanship, supervision, or design as a responsibility of the individual defendant. Proof of defect alone is not enough to establish the claim. Foreseeability limits the scope of the duty, and the passage of time following construction makes causation difficult to prove.

*Briggs v. Riversound Ltd. Partnership*, 942 S.W.2d 529, 531-32 (Tenn. Ct. App. 1996) (quoting

*Cosmopolitan Homes, Inc. v. Weller*, 663 P.2d 1041, 1045 (Colo. Sup. Ct. 1983)).

With respect to the Plaintiffs' claim for negligent construction, the court finds that the Verbelias' claims are contract claims and their complaints are not that Mr. Metcalf breached a standard of reasonable care, but that he breached warranty of habitability and fitness. The court will dismiss this cause of action.

### G.    Exaggeration of Lien Pursuant to Tenn. Code Ann. § 66-11-139

Tennessee law provides:

> If, in any action to enforce the lien provided by this chapter, the court finds that any lienor has willfully and grossly exaggerated the amount for which that person claims a lien, as stated in that person's notice of lien or pleading filed, in the discretion of the court, no recovery may be allowed thereon, and the lienor may be liable for any actual expenses incurred by the injured party, including attorneys' fees, as a result of the lienor's exaggeration.

Tenn. Code Ann. § 66-11-139. Although "a willful and gross exaggeration of the claim may allow the court to deny the claimant a lien," "nothing else appearing, it will not defeat the claimant's right to recover the amount justly due." *Dotson v. Gaidos*, 736 S.W.2d 119, 120 (Tenn. Ct. App. 1987).  An award of attorneys' fees may also be available for a successful exaggeration of lien claim pursuant to Tenn. Code Ann. § 66-11-139. *See GenTech Const., LLC*

*v. Natare Corp.*, No. 1:07-cv-192, 2011 WL 1257943, at *26 (E.D. Tenn. Mar. 31, 2011).

In discussing Tenn. Code Ann. § 66-11-139, as well as Tenn. Code Ann. § 66-11-138 and

§ 66-11-140, the Tennessee Supreme Court noted that "it has long been the rule in this state that

any furnisher of materials and supplies to a contractor must act in good faith. If he falsifies his

account or connives with a contractor to defraud the owner, he loses his right to enforce a lien."

*Hayes Pipe Supply, Inc. v. McKendree Manor, Inc.*, 695 S.W.2d 174, 178 (Tenn. Sup. Ct. 1985).

With respect to this claim by the Verbelias, the court concludes that no lien was ever filed

by Mr. Metcalf and therefore this is not a case in which he ever sought to enforce a lien. This

court does not find that this claim is applicable to this case and dismisses this claim against Mr.

Metcalf.

### H.    Liens of Other Subcontractors

Tennessee law provides:

(a)(1) Any prime contractor or remote contractor who, with intent to defraud, uses
the proceeds of any payment made to that contractor on account of improving
certain real property for any purpose other than to pay for labor performed on, or
materials, services, equipment, or machinery furnished by that contractor's order
for the real property, and overhead and profit related thereto, while any amount
for the labor, materials, services, equipment, machinery, overhead, or profit
remains unpaid shall be liable to an injured party for any damages and actual
expenses incurred, including attorneys' fees, if the damages and expenses
incurred are the result of the misapplication of the payment.
(2) A violation of subdivision (a)(1) is a Class E felony.
(b) Notwithstanding the provisions of subsection (a), there is no violation of this
section when:
(1) Funds are disbursed pursuant to written agreement; or
(2) The use of funds received and deposited in a business account for use on
multiple construction projects is based on the allocation of costs and profits in
accordance with generally accepted accounting principles for construction
projects.

Tenn. Code Ann. § 66-11-138. As the court in *Hayes Pipe Supply* noted, "a contractor receiving

payments from a landowner in this state is under a very strict statutory duty to apply those

47

payments properly and not to divert them so as to leave the landowner exposed to the possibility of a lien." 695 S.W.2d at 179. Further, "any use of funds by a contractor or supplier for any purpose other than payment of an account for materials or labor used to improve property of the one making payment, is prima facie evidence of intent to defraud." *Alside Supply Center v. Vinson*, 802 S.W.2d 632, 634 (Tenn. Ct. App. 1990). *See also,* Tenn. Code Ann. § 66-11-140. In addition, "it has long been the rule in [Tennessee] that any furnisher of materials and supplies to a contract must act in good faith. If he falsifies his account or connives with a contractor to defraud the owner, he loses his right to enforce a lien." *Hayes Pipe Supply*, 695 S.W.2d at 178.

The Verbelias proved what they paid Mr. Metcalf, but they did not show that their money had been spent on other jobs. They acknowledged that he was working on other jobs, and from the court's tabulation of the funds received, there is approximately $80,000 for which he did not account. The court was not provided a complete picture of the flow of funds through the bank records. Mrs. Verbelia testified that one payment of $10,000 was made in cash. She also refers to a $25,000 deposit which never appeared in the bank statements, but the bank statement was not offered into evidence. B. Verbelia Test., April 7, 2014, 4:54-4:58 p.m. The Verbelias would have the court find that the Debtor's testimony is not credible about what was spent and then proceed even further to the conclusion that their funds were spent on another project. The burden to prove the violation is on the Verbelias, and the court will not take the next step without evidence that their funds were used on other jobs.

Three subcontractors placed liens on the Verbelias' property for debts that should have been paid by the Defendant pursuant to Tenn. Code Ann. § 66-11-138. As noted in the prior section reciting the facts, those liens were the lien of Cantrell Carden Guttering for $8,361.57, Garage Door Services for $4,439.00, and Tennessee Valley Ready Mix for $4,815.20. *See* Trial

48

Ex. 19. Although the materials were provided while Mr. Metcalf was still on the job and

receiving payments from the Verbelias, the Verbelias did not prove which payment they made

was directed to pay any one of these lienholders. They offered no proof to show that funds were

diverted to pay another job. They stopped paying before the contract price had been paid to

ensure that their son-in-law was paid. The contract did not require invoices to be presented for

progress payments and there were no specific representations by Mr. Metcalf requesting money

to pay to these suppliers. They have not demonstrated that Mr. Metcalf violated Tenn. Code Ann.

§ 66-11-138.

## I.     Rescission

The Plaintiffs, in addition to their claim for breach of contract, also assert a claim for

rescission. Courts in Tennessee have emphasized that "[t]he remedy of rescission is a

discretionary matter which should be exercised sparingly and only when the situation demands

such." *James Cable Partners, L.P. v. City of Jamestown*, 818 S.W.2d 338, 343 (Tenn. Ct. App.

1991). Rescission is not "favored in Tennessee," but may be available due to a mutual mistake:

> Where parties have apparently entered into a contract evidenced by a writing, but
> owing to a mistake of their minds did not meet as to all the essential elements of
> the transaction, so that no real contract was made by them, then a court of equity
> will interpose to rescind and cancel the apparent contract as written, and to restore
> the parties to their former positions, the rule being the same whether the
> instrument relates to an executory agreement or to one which has been executed.
> Furthermore, equity will grant relief on the ground of mistake, not only when the
> mistake is expressly proved, but also when it is implied from the nature of the
> transaction. It is not essential that either party should have been guilty of fraud.

*Klosterman Devel. Corp. v. Outlaw Aircraft Sales, Inc.*, 102 S.W.3d 621, 631 (Tenn. Ct. App.

2002) (quoting *Robinson v. Brooks*, 577 S.W.2d 207, 208 (Tenn. Ct. App. 1978)). A court may

grant rescission on the basis of a unilateral mistake only where there was fraud or

misrepresentation. *See Castleton Capital Co., L.L.C. v. Burch*, No. M2001-01597-COA-R3-CV,

2004 WL 892525, at *2 (Tenn. Ct. App. Apr. 23, 2004). Rescission may only be granted if the

plaintiff demonstrates the elements of such a claim by clear and convincing evidence. *Cato v.*

*Batts*, No. M2009-02204-COA-R3-CV, 2011 WL 579153, at *9 (Tenn. Ct. App. Feb. 17, 2011).

If a remedy at law, such as damages, can compensate a party, rescission is not appropriate. *See*

*id.* The court finds that monetary damages can compensate the Verbelias in this case, and

rescission is not appropriate for several reasons. The Verbelias have asked for a judgment for

damages, and the court finds that money damages would allow them to make repairs and pay

lienholders. In addition, rescission is impractical. Rescission would require Mr. Metcalf to return

the $287,458.22 which he received from the Plaintiffs. The Verbelias would have to return the

house and all of the materials which Mr. Metcalf did purchase with their funds. This is not even a

situation in which Mr. Metcalf could sell the house because it sits on a 37-acre tract for which he

paid no consideration and which is uniquely desirable to the Verbelias because of its proximity

to their family.

### J.    Punitive Damages

The Plaintiffs also seek punitive damages. Tennessee courts maintain that "an award of

punitive damages is limited to 'the most egregious cases' and is proper only where there is clear

and convincing proof that the defendant has acted either 'intentionally, fraudulently, maliciously,

or recklessly.'" *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n. 14 (Tenn. Sup. Ct. 2012)

(citing *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 187 (Tenn. Sup. Ct. 2009) and

*Hodges v. S.C. Toof & Co.*, 833 S.W. 2d 896, 901 (Tenn. Sup. Ct. 1992)). Punitive damages "are

intended to 'punish a defendant, to deter him from committing acts of a similar nature, and to

make a public example of him.'" *Goff*, 297 S.W.3d at 187 (quoting *Huckeby v. Spangler*, 563

S.W.2d 555, 558-59 (Tenn. Sup. Ct. 1978)). A bankruptcy court may award punitive damages

for a Section 523 claim if it finds that the standard for punitive damages under state law has been met. *See e.g. R&L Pricecorp LLC v. Hall (In re Hall)*, No. 12-3026, 2013 WL 1739658, at *2-5 (Bankr. E.D. Tenn. Apr. 23, 2013). A right to punitive damages must be demonstrated by clear and convincing evidence. *See Hodges*, 833 S.W.2d at 901; *Barrett v. Vann*, No. E2006-01283-COA-R3-CV, 2007 WL 2438025 (Tenn. Ct. App. Aug. 29, 2007).

The court has found that there was only one instance of fraud in this case for approximately $5000 related to the misrepresentations about an air conditioning unit. The remaining claims are contract claims. The parties have very different views of what was promised, what was delivered, and why the construction is deficient. It is a bad situation only made worse by the prolonged litigation in which these parties have engaged. The court does not believe that this is an appropriate case for punitive damages.

### K.    TCPA Claim

The Verbelias have alleged that Mr. Metcalf violated the TCPA. In their post-trial brief they cite Tenn. Code Ann. § 47-18-104(b)(7), (13), and (27) as the bases for their claim. [Doc. No. 85, Plaintiffs' Post-Trial Brief, pp. 13-15]. These subsections provide:

> (b)  The following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part: . . .
> (7) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; . . .
> (13) Representing that a service, replacement or repair is needed when it is not; . . .
> (27) Engaging in any other act or practice which is deceptive to the consumer or to any other person; provided, however, that enforcement of this subdivision (b)(27) is vested exclusively in the office of the attorney general and reporter and the director of the division; . . .

Tenn. Code Ann. § 47-18-104(b).

The TCPA also provides for a private right of action to recover actual damages for a

violation and treble damages for willful and knowing violations.

> (a)(1) Any person who suffers an ascertainable loss of property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damages. . . .
> (3) If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper, except that the court may not award exemplary or punitive damages for the same unfair or deceptive practice.

Tenn. Code Ann. § 47-18-109(a). A breach of contract alone will not be sufficient to establish a TCPA violation; rather, a "party bringing a TCPA action must prove that there was some deception, misrepresentation or unfairness, regardless of any breach of contract." *Barrett v. Vann*, No. E2006-01283-COA-R3-CV, 2007 WL 2438025, at *18 (Tenn. Ct. App. Aug. 29, 2007).

This private right also includes the right to attorney's fees for person bringing the action upon a finding by the court that a provision of this part has been violated. Tenn. Code Ann. § 47-18-109(e)(1). It also provides that the court may order the Plaintiff to indemnify the defendant for his damages and attorney's fees  "[i]n any private action commenced under this section, upon finding that the action is frivolous, without legal or factual merit, or brought for the purpose of harassment…." Tenn. Code Ann. § 47-18-109(e)(2).

Taking the three alleged violations in reverse order, the court finds that as to subsection (27) of Tenn. Code Ann. § 47-18-104(b), there is no private cause of action. The enforcement is vested exclusively in the attorney general and reporter and director of the division. Tenn. Code Ann. § 47-18-104(b)(27). *See also, Silvestro v. Bank of America,* No. 3-13-0066, 2013 WL 1149301, at *5 n.3 (M.D. Tenn. March 19, 2013). The Verbelias cite a 2007 case which allowed a private cause of action. *Le Conte Properties, L.P. v. Applied Flooring Sys., Inc.* No. E2006-

01122-COA-R3-CV, 2007 WL 1108904, at *6 (Tenn. Ct. App. April 13, 2007). In 2011 this

subsection was amended to limit standing to pursue claims under the "catch all" provision. *See*

*Hanson v. J.C. Hobbs Co., Inc.*, No. W2011-02523-COA-R3-CV, 2012 WL 5873582, at *9 n.3

(Tenn. Ct. App. Nov. 21, 2012).

As to subsection (13), the court does not find that the Verbelias proved that Mr. Metcalf

stated that there were items needing to be replaced or the residence needing repairs. Their

complaints center on Mr. Metcalf's position that he did the job well and that repairs were **not**

needed. The court does not find that the Verbelias proved the existence of a deceptive or unfair

act of the type described in subsection (13).

Finally, as to subsection (7), the court does find that Mr. Metcalf did make

representations that his services would be "expert" and "workmanlike." The court must

determine whether those comments made at the time of negotiating the contract are a deceptive

or unfair act. Although the TCPA does not define the terms "deceptive" or "unfair", Tennessee

courts have explored the meaning of such terms:

> The concept of deceptiveness is a broader, more flexible standard of actionable
> merchant misconduct than the traditional remedy of common-law fraud. A
> deceptive act or practice is one that causes or tends to cause a consumer to believe
> what is false or that misleads or tends to mislead a consumer as to a matter of fact.
> Thus, for the purposes of the TCPA . . . ., the essence of deception is misleading
> consumers by a merchant's statements, silence, or actions.
> The concept of unfairness is even broader than the concept of deceptiveness, and
> it applies to various abusive business practices that are not necessarily deceptive. .
> . . an act or practice should not be deemed unfair "unless the act or practice causes
> or is likely to cause substantial injury to consumers which is not reasonably
> avoidable by consumers themselves and not outweighed by countervailing
> benefits to consumers or to competition."

*Tucker v. Sierra Builders*, 180 S.W.3d 109, 116-117 (Tenn. Ct. App. 2005) (quoting 15 U.S.C.A.

§ 45(n)).

The representations regarding Mr. Metcalf's expertise fall short of creating a

nondischargeable debt for fraud under the standards of the Bankruptcy Code, but they do qualify

as a deceptive and unfair act under the broader, more flexible standard of the TCPA.

> The scope of the TCPA is much broader than that of common-law fraud. Under the TCPA, a consumer can obtain recovery without having to meet the burden of proof that is required in common-law fraud cases, and the numerous defenses that are available to the defendant in a common-law fraud case are simply not available to the defendant in a TCPA case. Misrepresentations that would not be actionable as common-law fraud may nevertheless be actionable under the provisions of the little FTC acts, including the TCPA.

*Tucker v. Sierra Builders*, 180 S.W. 3d at 115 (footnotes and citations omitted).

As for damages related to this claim, the court has no basis on which to award any

additional damages other than those awarded for the breach of the contract. However, unlike the

contract which did not provide for attorney's fees, reasonable attorney's fees and costs are also

available under the TCPA upon a plaintiff's demonstration of a violation of the act. *See* Tenn.

Code Ann. § 47-18-109(e)(1). The court will therefore set a hearing for further proof on the

amount of fees to be awarded upon a motion by the Plaintiffs to do so.  Because the court does

not find that the representations were "knowing and willful" based on the court's findings with

respect to its analysis of the intent element of the fraud claim, any such fees awarded will be

dischargeable.

Finally, the court does not find that treble damages are appropriate. A court has the

discretion to award an amount lesser than treble damages if it feels that a lesser amount is

warranted. *See Bowling*, 300 S.W.3d at 297. In *Bowling* the appellate court affirmed the trial

court's award of damages without trebling under the TCPA against construction contractors who

falsely represented that they were licensed, bonded and insured when they were not. *Id.* For the

reasons stated above related to punitive damages, the court does not find that this is a case in

which the trebling of damages is appropriate.

IV.    **Conclusion**

The court finds that the Plaintiffs have allowed claims against the Debtor in the amount of $246,874.13 due to the Debtor's breach of contract. This amount will be increased by the amount of attorney's fees which may be awarded under the TCPA by this court at a subsequent hearing to be set upon a motion for determination of attorney's fees which may be filed at the discretion of the Verbelias.

Of this award for contract damages, the court finds that $4000 represents a debt that is owed to the Verbelias on account of fraud or misrepresentations made during the course of the contracting for the construction of their residence. Based on that finding, the court will sustain the objection to the dischargeability of that debt pursuant to Section 523(a)(2)(A)  and  enter a nondischargeable judgment in favor of the Plaintiffs in the amount of $4000. The objection to the dischargeability of the remaining amount of damages awarded is overruled. The Plaintiffs' other state law claims shall be dismissed.

A separate order will enter.

# # #

| Trial Exhibit Page # | Check # | Amount | Paid to | TOTALS |
|---|---|---|---|---|
| 3 | 4794 | 600.00 | Melvin Metcalf | |
| | 4795 | 324.00 | Justin Morrison | |
| 4 | 4778 | 175.73 | Co op | |
| | 4784 | 11,720.00 | B….. Products, Inc. | |
| | 4785 | 229.24 | Franklin Lumber | |
| | 4789 | 670.00 | Mark Franklin | |
| 6 | 4845 | 1,212.50 | 84 lumber | |
| | 4847 | 216.00 | Justin Morrison | |
| | 4849 | 384.00 | Melvin Metcalf | |
| | 4842 | 15,534.28 | Empire LLP | |
| | 4846 | 364.00 | Mark Franklin | |
| | 4848 | 160.00 | James Metcalf | |
| 7 | 4942 | 5,000.00 | Empire LLP | |
| | 4945 | 8,582.03 | Empire LLP | |
| 8 | 4947 | 160.00 | Marty Farris | |
| | 4956 | 775.00 | Rob Gifford | |
| | 4960 | 308.00 | Justin Morrison | |
| | 4948 | 600.00 | Melvin Metcalf | |
| | 4957 | 648.07 | Sequatchie Concrete | |
| | 4955 | 1,337.38 | IMI | |
| 9 | 4890 | 366.01 | IMI | |
| | 4892 | 480.00 | Melvin Metcalf | |
| | 4895 | 308.00 | Justin Morrison | |
| | 4900 | 150.00 | James Metcalf | |
| | 4893 | 120.00 | Marty Farris | |
| | 4896 | 338.00 | Mark Franklin | |
| | 4898 | 10,000.00 | 84 lumber | |
| 10 | 4904 | 927.50 | Premnear | |
| | 4906 | 500.00 | Mark Franklin | |
| | 4908 | 600.00 | Melvin Metcalf | |
| | 4910 | 104.00 | Marty Farris | |
| | 4903 | 3,338.72 | Sequatchie Concrete | |
| | 4907 | 385.00 | Justin Morrison | |
| | 4909 | 272.00 | James Metcalf | |
| | 4912 | 280.00 | Blain Cash | |
| 11 | 5426 | 100.00 | Cash | |
| | 5418 | 1,000.00 | Thomas Garcia | |

|    | 5424 | 3,300.00 | Luis Battle (?) | |
| 12 | 5414 | 1,100.00 | Alexander Roteeb | |
| 13 | 5451 | 1,000.00 | Thomas Garcia | |
|    | 5455 | 3,176.00 | Billy Sanders | |
| 14 | 5441 | 600.00 | Cash | |
|    | 5449 | 1,000.00 | Thomas Garcia | |
|    | 5444 | 458.85 | Tennessee Valley Concrete | |
|    | 5448 | 5,618.32 | Interstate Block | |
|    | 5450 | 1,058.08 | Tennessee Valley Concrete | |
| 15 | 5220 | 462.13 | Interstate Block | |
| 16 | 5232 | 1,200.00 | Thomas Garcia | |
|    | 5233 | 2,500.00 | Robert Shumack | |
| 17 | 5234 | 5,000.00 | Melvin Metcalf | ** |
|    | 5242 | 600.00 | Darren Turner | |
| 18 | 5246 | 9,932.92 | Henley Supply | |
|    | 5247 | 6,738.17 | Discount Plumbing & Electric | |
| 20 | 5292 | 1,000.00 | Thomas Garcia | |
|    | 5279 | 252.00 | James Metcalf | |
| 21 | 5256 | 100.00 | Cash | |
|    | 5258 | 256.00 | James Metcalf | |
|    | 5260 | 2,000.00 | Thomas Garcia | |
|    | 5257 | 229.02 | Patty Electrical | |
|    | 5266 | 13,728.76 | Interstate Block | |
| 22 | 5274 | 4,000.00 | Samuel Rodriquez | |
|    | 5277 | 2,000.00 | John Lidstrom | |
| 23 | 5307 | 243.00 | James Metcalf | |
|    | 5313 | 2,000.00 | Cash | |
|    | 5312 | 364.70 | Henley Supply | |
| 24 | 5300 | 458.54 | Reliable Rental | |
|    | 5304 | 732.52 | Tennessee Valley Concrete | |
|    | 5306 | 2,000.00 | Thomas Garcia | |
| 25 | 5319 | 360.00 | James Metcalf | |
|    | 5325 | 2,294.25 | Tennessee Valley Concrete | |
|    | 5320 | 3,000.00 | Thomas Garcia | |
| 26 | 5327 | 200.00 | James Metcalf | |
| 27 | 5352 | 1,000.00 | Thomas Garcia | |
|    | 5351 | 360.00 | James Metcalf | |
| 28 | 5341 | 4,200.00 | Samuel Rodriquez | |
|    | 5343 | 1,000.00 | Thomas Garcia | |
| 29 | 5429 | 2,500.00 | Luis Battle (?) | |
| 30 | 5432 | 450.00 | Thomas Garcia | |
|    | 5431 | 668.61 | Tennessee Valley Concrete | |
| 31 | 5166 | 458.45 | Construction Mart | |
|    | 5168 | 3,001.00 | Henley Supply | |

| | | | | |
|---|---|---|---|---|
| 32 | 5176 | 500.00 | Darren Turner | |
| | 5177 | 176.23 | Franklin Lumber | |
| 33 | 5469 | 65.55 | Construction Waste Management | |
| | 5471 | 2,181.67 | Pro Karduane | |
| | 5470 | 2,536.54 | Discount Plumbing | |
| | 5472 | 5,000.00 | Thomas Garcia | |
| 34 | 5491 | 4,400.00 | Danby Air | |
| | 5490 | 4,000.00 | David Pinion | |
| 36 | 5457 | 1,546.43 | Tennessee Valley Concrete | |
| | 5461 | 257.80 | Patty Electrical | |
| | 5459 | 662.33 | Rodgers Group | |
| 38 | 5507 | 6,850.77 | Cumberland Materials | |
| 40 | 5295 | 764.65 | Tennessee Valley Concrete | |
| | 5296 | 1,000.00 | John Lidstrom | |

**$190,812.75**

| | | | | |
|---|---|---|---|---|
| **CHECK STUBS** | | | | |
| 41 | 5470 | 2,536.54 | Discount Plumbing | * |
| | 5472 | 5,000.00 | Pro Karduane | * |
| | 5490 | 4,000.00 | David Pinion | * |
| 43 | 5455 | 3,176.00 | Bill Sanders | * |
| | 5457 | 1,546.43 | Tennessee Valley Concrete | * |
| | 5459 | 662.33 | Rodgers Group | * |
| 45 | 5443 | 100.00 | Cash | |
| | 5444 | 458.85 | Tennessee Valley Concrete | * |
| | 5449 | 1,000.00 | Thomas Garcia | * |
| | 5450 | 1,058.08 | Tennessee Valley Concrete | * |
| | 5451 | 1,000.00 | Thomas Garcia | * |
| 47 | 5424 | 3,300.00 | Duey Botello | |
| | 5431 | 668.61 | Tennessee Valley Concrete | * |
| | 5432 | 450.00 | Thomas Garcia | * |
| 49 | 5349 | 27.00 | Dept. of Commerce inspection | |
| | 5416 | 4,136.00 | Printess Wilkenson | |
| 51 | 5304 | 732.52 | Tennessee Valley Concrete | * |
| | 5305 | 1,000.00 | Cash | |
| | 4306 | 2,000.00 | Thomas Garcia | * |
| 53 | 5277 | 2,000.00 | John Lidstrom | * |
| | 5296 | 1,000.00 | John Lidstrom | * |
| 55 | 5246 | 9,932.92 | Henley Supply | * |
| | 5247 | 6,738.17 | Discount Plumbing | * |
| | 5266 | 13,728.76 | Interstate Block | * |
| 57 | 5206 | 384.00 | Samuel Rodriguez | |
| | 5207 | 160.00 | James Metcalf | |
| | 5233 | 2,500.00 | Mark | * |

| | | | | |
|---|---|---|---|---|
| 59 | 4957 | 648.07 | Sequatchie | * |
| | 5080 | 110.92 | 84 Lumber | |
| 61 | 4945 | 8,582.03 | Empire LLC | * |
| | 4947 | 160.00 | Marty Farris | * |
| | 4955 | 1,337.78 | IMI | * |
| | 4956 | 775.00 | Dale Gifford | * |
| 63 | 4942 | 5,000.00 | Empire LLC | * |
| 65 | 4862 | 1,939.37 | Sequatchie Concrete | |
| | 4903 | 3,338.70 | Sequatchie Concrete | * |
| | 4904 | 927.50 | Premnear | * |
| 67 | 4814 | 600.00 | Melvin Metcalf | |
| | 4842 | 15,534.28 | Empire LLC | * |
| 69 | 4805 | 1,380.36 | Rodgers Group | |
| | 4808 | 1,392.06 | Rodgers Group | |
| 71 | 4798 | 1,400.00 | Wilkenson Electric | |
| 73 | 4775 | 129.65 | Co. Op. | |
| | 4776 | 800.00 | J&J Trenching | |

**$113,351.93**

$304,164.68

Duplicates   *   $96,492.57

**$207,672.11**

**      When going through the check register this is the one he said does not go with this account.